IN THE UNITED STATES DISTRICT COURT FOR THE
DISTRICT OF KANSAS

| | | |
|---|---|---|
| HEARTLAND OUTDOOR, INC. D/B/A HEARTLAND OUTDOOR, | ) ) ) | |
| Petitioner, | ) ) ) | |
| v. | ) ) | Case No.   6:23-cv-01182 |
| WILLIAM J. MILLER Director of Industry Operations Bureau of Alcohol Tobacco Firearms and Explosives, | ) ) ) ) ) ) | |
| Respondent. | ) | |

**MEMORANDUM IN SUPPORT OF
EMERGENCY MOTION FOR TEMPORARY RESTRAINING ORDER
AND FOR PRELIMINARY INJUNCTION**

As demonstrated by Petitioner's Verified Complaint, the supporting affidavit, and this memorandum, Heartland Outdoor ("Heartland") faces imminent irreparable harm from Respondent's unjustified revocation of its FFL:

1. Respondent's enforcement of the revocation of Heartland's FFL, unless temporarily restrained, will continue to result in immediate and irreparable injury to the business to the extent that the practical effectiveness of temporary relief which may be granted in connection with Heartland's motion for a preliminary injunction will be significantly diminished. Specifically, Heartland will be effectively out of business, and whether it has an FFL at the close of this case simply will not matter;

2. The issuance of a TRO will not cause undue harm, substantial inconvenience or loss to Respondent, and on balance, whatever inconvenience that may be caused to Respondent is substantially less than the actual injury to Heartland and its employees;

1

3. The public will not be adversely affected by the issuance of a TRO and preliminary injunction, and in fact, the public's interest will be protected by such; and

4. Heartland can demonstrate a probability of success on the merits, or alternatively, serious questions going to the merits, such that the balance of hardship sharply favors the protection of its interests by the issuance of a TRO and ultimately a preliminary injunction.

Accordingly, this Court should prevent the total loss of Heartland's business and the resulting harm to its owner, employees, and the public by granting the injunctive relief now sought.

## MEMORANDUM OF POINTS AND AUTHORITY

A TRO and a preliminary injunction serve to preserve the status quo and keep the parties, as much as possible, in their respective positions they occupied when the suit began (i.e., with Heartland holding an FFL and being in business). *University of Texas, et al., v. Camenisch,* 451 U.S. 390, *395 (1981). Here, a TRO and a preliminary injunction are necessary to prevent Respondent from placing the very existence of Heartland's business in jeopardy and to maintain the status quo -- *i.e.,* Heartland as a viable business -- until consideration on the merits.

## BACKGROUND – STATEMENT OF FACTS

The relevant facts are set forth in the accompanying affidavit of Roger Theede. (Ex. A.)

## ARGUMENT AND AUTHORITIES

Under the law of the Tenth Circuit, this Court must consider and balance the following four factors in deciding whether to issue the TRO and preliminary injunction:

1. Likelihood of success that Heartland will eventually prevail on the merits;

2. Whether Heartland will suffer irreparable harm if the injunction is not granted;

3. Whether the threatened injury to Heartland outweighs whatever damage the proposed injunction may cause Respondent; and

4. Whether the injunction, if issued, will not disserve or adversely affect the public interest.

*Attorney General of Okla. v. Tyson Foods, Inc.*, 565 F.3d 769, 776 (10th Cir. 2009). A grant or denial of a preliminary injunction is within the discretion of the trial court and may not be set aside unless based on an error of law or abuse of discretion. *Otero Savings & Loan Association v. Federal Reserve Bank,* 665 F.2d 275, 276 (10th Cir. 1981). "To justify a temporary injunction it is not necessary that the plaintiff's right to a final decision, after a trial, be absolutely certain, wholly without doubt; if the other elements are present (i.e., the balance of hardships tips decidedly toward plaintiff), it will ordinarily be enough that the plaintiff has raised questions going to the merits so serious, substantial, difficult and doubtful, as to make them a fair ground for litigation and thus for more deliberate investigation.'" *Continental Oil Co. v. Frontier Refining Co.,* 338 F.2d 780, 781-782 (10th Cir. 1964). The 8th Circuit has clarified that the "probability of success" element does not place a burden on a movant to demonstrate "a greater than fifty per cent likelihood that he will prevail on the merits." *See, Dataphase Sys. v. C L Sys.,* 640 F.2d 109, 113 (8th Cir. 1981).

> The very nature of the inquiry on petition for preliminary injunction relief militates against a wooden application of the probability test. At base, the question is whether the balance of equities so favors the movant that justice requires the court to intervene to preserve the status quo until the merits are determined. The equitable nature of the proceeding mandates that the court's approach be flexible enough to encompass the particular circumstances of each case. Thus, an effort to apply the probability language to all cases with mathematical precision is misplaced.
>
> In balancing the equities no single factor is determinative. The likelihood that plaintiff ultimately will prevail is meaningless in isolation. In every case, it must be examined in the context of the relative injuries to the parties and the public. If the chance of irreparable injury to the movant should relief be denied is outweighed by the likely injury to the other parties litigant should the injunction be granted, the moving party faces a heavy burden of demonstrating that he is likely to prevail on the merits. Conversely, <u>where the movant has raised a substantial question and the equities are otherwise strongly in his favor, the showing of success on the merits can be less</u>.

Importantly, two recent District Court decisions awarded precisely the relief that Heartland seeks here. In *Streicher's, Inc. v. Hummel,* the District of Minnesota enjoined ATF's discontinuation of an FFL's license when the FFL had no prior violations, and the revocation was based upon a handful of common violations:

> ATF has cited no court decisions in which a federal firearms license has been revoked for conduct akin to that at issue here: a small number of violations and the licensee's first violations of the particular type. Indeed, as Streicher's argues, most revocations are premised on numerous and repeated violations ...
> * * *
> Although only one violation of the statute is required for revocation, ATF has pointed to no other case revoking a federal firearms license for one violation. As ATF argued at the hearing on this Motion, the public interest requires the uniform application of the federal firearms laws.

*Streicher's, Inc. v. Hummel,* 2023 U.S. Dist. LEXIS 68898, *13 (D. Minn. 2023). Similarly, in *Web Guy Enterprises v. Bowers*, the Western District of Missouri granted a temporary restraining order and subsequent preliminary injunction on a record with violations far more extensive that the present and no track record of prior, clean inspections. *See, Web Guy Enterprises v. Bowers*, Case No. 15-06139-CV (W.D. Mo. 2015) (copy attached as Exhibit B).

**I.      HEARTLAND WILL LIKELY SUCCEED ON THE MERITS.**

There are two main issues for this Court to consider *de novo* during these proceedings: (1) whether Heartland committed the violations set forth in the Final Notice, and (2) if so, whether such violations were committed willfully. *See,* 18 U.S.C. § 923(e), (f)(3).[3] For present

---

[3]      Additionally, 18 U.S.C. § 923(f)(2) provides for a stay of the revocation pending judicial review, because if the revocation must be stayed during the administrative stage where there is no meaningful opportunity to do much of anything (*i.e.,* no subpoenas, no oaths, an ATF inspector as the hearing officer, etc.), it must also be stayed during a meaningful *de novo* judicial review. *See also,* 18 U.S.C. § 925(b), pursuant to which a licensee may continue in business while under indictment and until any conviction becomes final and appeals are exhausted. If a licensee may continue doing business while under indictment in an actual court of law, they certainly should be permitted to do so based on a civil, administrative ruling from ATF, such as the Final Notice. 27 C.F.R. § 478.78 does nothing to change this fact since it oversteps any grant of authority from Congress and is invalid. *See, FDA v. Brown & Williamson Tobacco Corp.,* 529 U.S. 120, 161 (2000).

purposes, the Court may focus on the second issue, because even assuming the violations occurred, they were not committed willfully under the Gun Control Act ("GCA").

A dealer willfully violates the GCA when it "intentionally, knowingly or recklessly violates known legal requirements. Just as [the United States Supreme Court in] Safeco construed the phrase 'willfully fails to comply' to reach only deliberate, knowing or reckless statutory violations [citation omitted], so we interpret the phrase 'willfully violated' to do the same." *Armalite, Inc. v. Lambert,* 2008 U.S.App. Lexis 21570, *13 (6th Cir. 2008); *Weaver v. Harris,* 486 Fed. Appx. 503, 505 (5th Cir. 2012) ("To prove that a firearms dealer 'willfully' violated the law, [the Director] must show that the dealer either intentionally and knowingly violated its obligations or was recklessly or plainly indifferent despite the dealer's awareness of the law's requirements.") Thus, conduct that is merely negligent does not rise to the level of willful under the GCA and cannot support a license revocation. *Id. See also, RSM, Inc. v. Herbert,* 466 F.3d 316, 320-322 (4th Cir. 2006) ("To be sure, a single, or even a few, inadvertent errors in failing to complete forms may not amount to 'willful failures, even when the legal requirement to complete the forms was known."); *Willingham Sports, Inc. v. BATF,* 415 F.3d 1274, 1277 (11th Cir. 2005); *Prino v. Simon,* 606 F.2d 449, 451 (4th Cir. 1979). "Willfully" was added to the GCA by Section 103(5) of the Firearms Owners Protection Act of 1986 ("FOPA"), Pub. L. 99-308, 100 Stat. 449, 453 (1986), and Congress intended that "willfully" in a license revocation context be interpreted to have real meaning and significance. *See,* e.g. *Rich v. United States,* 383 F.Supp. 797 (S.D.Ohio 1974) ("Congress was concerned with purposeful, intentional conduct to be punished by revocation of licenses rather than mere negligence on the part of the licensee."); *Bryan v. Harris*, 524 U.S. 184, 195 (1998) ("[FOPA] was enacted to protect law-abiding citizens who might inadvertently violate the law.")

The FOPA's addition of the word "willfulness" into the Gun Control Act must be interpreted to have some meaning. Although FFLs may be generally presumed to have knowledge of regulations governing their license, that mere knowledge, without evidence of "willful" intent to violate, is clearly not enough. Otherwise, all that the ATF would ever need to show to justify a revocation would be evidence of one violation, without any level of intent.

Additionally, the totality of the circumstances and all mitigating factors must be taken into consideration in determining whether a licensee's violation of the GCA is indeed willful. Overturning ATF's determination of willfulness after a bench trial, one court explicitly addressed what others merely implicitly assume: the word "willful" was inserted into the GCA by the FOPA for a reason, and a genuine analysis of the FFL's "willfulness" must be undertaken. *Jim's Pawn Shop v. Bowers,* 2008 U.S. Dist. Lexis 97199, *21-23 (E.D.N.C. 2008). Refusing to rubber-stamp the ATF, the court applied the standard articulated by the Fourth Circuit in *RSM*:

> To be sure, a single, or even a few, inadvertent errors in failing to complete forms may not amount to "willful" failures, even when the legal requirement to complete the forms was known. At some point, when such errors continue or even increase in the face of repeated warnings given by enforcement officials, accompanied by explanations of the severity of the failures, one may infer as a matter of law that the licensee simply does not care about the legal requirements. *At that point,* the failures show the licensee's plain indifference and therefore become willful.

*Id.* at *20 (citing *RSM*, 466 F.3d at 322). The court carefully reviewed the evidence and determined it did not reach the "point" of a "willful" violation. *Id.* at *23-25.

### A. Heartland Did Not Willfully Violate the Gun Control Act in Making Its December 16, 2021 Transfer of a Firearm to Buddy Norris.

ATF's revocation of Heartland's FFL revolves around its unwarranted assumption that the December 16, 2021 transfer of a rifle to Buddy Norris was an illegal "straw purchase" and

6

was actually intended for Mr. Norris' wife, Patti.[4] Specifically, on December 11, 2021, Patti Norris came to Heartland and stated her intention to purchase a particular rifle for her husband as a Christmas gift. The rifle was a Springfield Saint Victor 5.56 rifle with an optic included, and Heartland had only one in stock. Mrs. Norris completed the ATF Form 4473 Firearm Transaction Record indicating that she was the "actual purchaser" of the firearm.[5] When Heartland submitted its NICS background check, a "delay" response was returned. On December 16, 2021, NICS updated its response to "denied," and Mrs. Norris was notified.

While she could not surprise her husband with the gift on Christmas morning like she wanted, Mrs. Norris told her husband of her intention to gift him the gun and accompanied him to the store so he could purchase it for himself.[6] Mr. Norris completed an ATF Form 4473, his NICS background check was approved, and he went home that day with his new rifle. Mr. Norris was not prohibited from possessing or receiving the rifle.

When ATF reviewed Heartland's 4473 Forms and saw the denial for Mrs. Norris and the subsequent purchase of the same firearm by Mr. Norris, it jumped to the conclusion that Mr. Norris "straw purchased" the firearm for his wife. In fact, the intended recipient of the firearm was always Mr. Norris, not Mrs. Norris, as Mrs. Norris originally sought to purchase it as a gift for him. ATF presented no evidence at the hearing to support this conclusion. Specifically, ATF

---

[4] The remaining violations cited are among the most common paperwork violations cited in thousands of inspections around the country every year. *See,* https://www.atf.gov/resource-center/fact-sheet/fact-sheet-facts-and-figures-fiscal-year-2022. For instance, ATF's Final Notice of Revocation issued on July 20, 2023, cites eighteen instances of Heartland Outdoor's alleged failure to timely record the disposition of a firearm in its acquisition and disposition records. That violation was ATF's most commonly cited violation in 2022 among all FFLs, with 33,526 instances reported by ATF. To revoke a license on a handful of paperwork violations that are commonly found on nearly every inspection -- especially in view of no prior adverse action history -- is virtually unprecedented.

[5] The instructions on ATF Form 4473 explicitly state that a person who comes to an FFL to purchase a firearm as a *bona fide* gift for another is the "actual purchaser" on that transaction and should mark the form accordingly.

[6] Mrs. Norris could have gifted Mr. Norris cash or a gift card, but the particular firearm was the only one of its kind in stock, and there was no guarantee there would still be one there after Christmas.

did not present any evidence as to where the firearm currently is, whether Mrs. Norris has ever handled, shot, or even seen the firearm since Mr. Norris acquired it, etc. Nonetheless, ATF assumed Mr. Norris purchased the firearm for his wife instead of for himself, with no evidence to support that assumption and despite testimony to the contrary.

The transaction was not a "straw purchase," and Heartland did not "falsify records." Mr. Norris was legally entitled to purchase the firearm for himself, and all of the evidence is that he did in fact do so. His wife's inability to purchase the firearm for him has no bearing on his right to purchase the firearm for himself. ATF's classification of the transaction as a "straw purchase" is simply contrary to the evidence. If, somehow, Mr. Norris was not the "actual purchaser,"[7] there is nothing in the record to indicate that if somehow in the semantics of the matter there was confusion it rises to the level of a willful violation. Heartland firmly believed that it handled the transaction properly at the time, and there is nothing in the record below to indicate otherwise.

B. **Heartland Did Not Willfully Violate the GCA in Any Other Manner.**

To the extent that ATF bases its revocation action on any other allegedly willful violation noted in the Final Notice, seemingly as an afterthought, that is a red herring.[8] It is relatively common for an FFL to be cited for some violation following a compliance inspection (see Ex. A, ¶ 6), and ATF uses these inspections as an opportunity to continue to educate licensees as to their obligations under the applicable laws and regulations. Simply put, neither ATF nor the Court have ever assumed that the mere existence of violations necessarily indicates willfulness.

---

[7]     ATF cannot deny that in a case of gifted cash or a gift card, the "actual purchaser" is the person who completes the transaction and obtains the firearm. There is no legal distinction here, and the inability of Mrs. Norris to be the actual purchaser and gift Mr. Norris the physical firearm directly is immaterial to Mr. Norris's legal standing as the actual purchaser in his own transaction.

[8]     Only ATF possesses the official transcript of the administrative hearing at which these matters were addressed. This transcript will presumably be part of the administrative record provided to the Court by ATF as part of the evidence upon which this Court will conduct its *de novo* review.

As noted above, in one informative case, the court found that although the licensee had violated the GCA, the violations were not willful in nature, and the FFL revocation was vacated:

> Rather than compel the court to find willfulness due to petitioners' repeated violations, the holding in <u>RSM</u> empowers the court to infer willfulness at the point repeated violations become sufficient to conclude the licensee does not care to meet its requirements, thereby establishing plain indifference, or willfulness.
>
> The court finds that petitioners violated the GCA and its implementing regulations on each of the occasions detailed in the Final Notice...
>
> The court also finds that respondent has not shown, by a preponderance of the evidence, that any of the violations were willful.
>
> [The licensees] took many steps to increase their compliance with the GCA, including printing an employee manual dedicated to proper cataloging techniques, holding repeated training courses on how to keep proper records, establishing a calendar system to keep up with multiple sales, and designating one staff member at each store to be in charge of the A&D books.
>
> * * * *
>
> Finally, the government's own inspectors uniformly testified that the employees at [the licensees] were courteous and helpful throughout the inspections and even identified some of their own mistakes for the inspectors.
>
> Other than the violations themselves, there was no evidence that petitioners displayed a disregard for the regulations. In fact, the evidence shows the opposite.

*Jim's Pawn Shop,* 2008 U.S. Dist. Lexis 97199, *23-25 (copy attached as Exhibit C).

In *RSM*, the ATF revoked a Maryland dealer's FFL after the second warning conference and fourth inspection uncovered steady increases in compliance violations after every inspection. The evidence presented established a long history of repeated failures, warnings, and explanations during each of the four inspections, with violations including but not limited to 400 plus bad 4473 forms, 100 plus missing firearms, numerous missing multiple sale forms, incorrect NICS transaction numbers, off-book NFA items, and numerous other repeat violations. When asked to explain the repeated violations, the licensee blamed his employees and human error for

9

the mistakes and further testified that he failed to review and did not remember meeting with the ATF previously. *RSM, Inc. v. Herbert,* 466 F.3d 316, 320-322 (4th Cir. 2006).

Other cases where courts upheld a determination of willfulness are strikingly dissimilar to the present circumstances. Thus, although the courts in these cases ultimately determined that the record was such that ATF was authorized to make a determination of willfulness and revoke the licenses at issue, ATF did so only after following its policies and properly construing the matter (i.e. issuing warning letters, conducting follow-up in sections, etc.), which simply never happened here:

| Cases Upholding Revocation | Basis For Finding Willfulness |
|---|---|
| *McCallister v. United States* 2012 U.S. Dist. LEXIS 13866 (E.D. Mo. 2012) | Violations found willful after FFL was cited for violations in 2004 and 2008 for the same violations and then, following a 2008 warning conference, the same violations were found in a 2009 compliance inspection. Judgment was based upon licensee's "awareness of the record-keeping requirements and repeated violations." |
| *Pinion Enterprises, Inc. v. Ashcroft*, 371 F. Supp. 2d 1311 (N.D. Ala. 2005) | Violations found willful after FFL was cited on five previous occasions, was warned, had violations explained to him, and was specifically educated as to how to avoid further violations. |
| *Willingham Sports, Inc. v. BATF,* 415 F.3d 1274, 1277 (11th Cir. 2005) | FFL was inspected and cited for violations in 1990, 1992, and 1999 for failure to properly record A&D information and failure to properly complete Forms 4473. Following the 1999 inspection, ATF sent the FFL a letter advising him that repeat violations would be viewed as willful, and only after a fourth inspection revealed continued failure did ATF ultimately deny the FFL's renewal application. |
| *Shawano Gun & Loan v. Hughes* 2010 U.S. Dist. LEXIS 77907 (E.D. Wis. 2010) | Following 1999 and 2004 inspections with repeat violations, ATF held a warning conference discussing the inspection, the violations, and the necessary corrective action to prevent recurrence. 2007 inspection revealed several violations that FFL had been warned about from the prior inspections. This resulted in a revocation which was upheld by the District Court holding "The point is not to punish firearms dealers for violations, but rather to protect the public from firearms ending up in the wrong hands, which can easily happen where a licensed dealer repeatedly demonstrates plain indifference to the GCA requirements." |
| *Procaccio v. Lambert* | In finding willfulness, the Court noted "Petitioner does not dispute |

| | |
|---|---|
| 2006 U.S. Dist. LEXIS 50748 (N.D. Ohio 2006) | that the ATF consistently warned him about the particular record keeping violations, and that he continued to repeat the same violations over the course of his two decades in business." The FFL had been inspected in 1993, 1994, 2000, and 2003, with repeat violations before ATF refused to renew FFL in 2004. |
| *Athens Pawn Shop v. Bennett*, 2010 U.S. App. LEXIS 2005 (5th Cir. 2010) | "The evidence showed that Athens Pawn Shop had been cited on at least three prior occasions for the same or similar violations of the requirements for maintaining accurate acquisition and disposition records. It was also specifically warned that its license was contingent on compliance with federal regulations and that future violations would be considered willful and could jeopardize its license." |
| *T.T. Salvage Auction Co. v. Secretary of the Treasury* 859 F.Supp 97 (E.D. N.C. 1994) | Court upheld determination of willfulness when FFL had demonstrated a "long history of noncompliance" including three inspections and a warning conference. |
| *Cucchiara v. Secretary of the Treasury* 652 F.2d 28 (9th Cir. 1981) | Revocation upheld when third compliance inspection revealed that FFL had repeat violations of numerous legal requirements despite two prior "irregularities statements" and "multiple warnings." |
| *Strong v. U.S.* 422 F.Supp. 2d 712 (N.D. Tex. 2006) | Court upheld determination of willfulness when FFL had been inspected on fourteen different occasions over a period of twenty-eight years resulting in six reports of violation. |
| *The General Store v. Van Loan* 560 F.3d 960 (9th Cir. 2009) | FFL inspected with violations in 2000, a subsequent 2001 inspection discovered repeat violations, and decision to revoke citing willfulness made after 2003 inspection. |

Further, other courts have upheld a finding of willfulness only when confronted with continuous failure to comply with the regulations following a series of failed inspections and warnings. *See, e.g., In re Vaughn,* 2005 U.S. Dist. LEXIS 41563 (N.D. Miss. 2005) (revocation following fourth inspection revealing repeat violation, court upheld determination of willfulness); *Farmer v. BATF,* 456 F. Supp. 2d 893 (W.D. Ohio 2006) (after a series failed inspections in 1995, 1996, 2001, and 2004, despite being told how to correct the violations at issue, FFL's continued violations were deemed willful); *Delange v. Alexander,* 2008 U.S. Dist. LEXIS 31437 (W.D. Mich 2008) (after a series of failed inspections in 1996, 1997, 2001, and 2005, and following two formal warnings, ATF revoked the FFL's license, and under such circumstances the reviewing court held that there was sufficient grounds to find willfulness); *Best Loan Co. v. Herbert,* 601 F.Supp.2d 749 (E.D.V.A 2009) (licensee was given numerous

chances to bring its operation into compliance, and it was only after it had been repeatedly informed of the regulations, warned of its offenses, and afforded additional opportunities by the ATF that the court concluded the licensee exhibited deliberate disregard and plain indifference toward its obligations).

Here, especially because Heartland had never before received even so much as a single report of violations, the alleged violations do not even remotely approach the type of record where courts have upheld a determination of willfulness. Thus, Heartland has demonstrated a likelihood of success on the merits such that the requested injunction should issue.

## II. WITHOUT THE REQUESTED INJUNCTION, HEARTLAND'S BUSINESS WILL BE LOST, AND BOTH HEARTLAND AND THE PUBLIC WILL BE IRREPARABLY HARMED.

A plaintiff satisfies the irreparable harm requirement by demonstrating "a significant risk that he or she will experience harm that cannot be compensated after the fact by monetary damages." *RoDa Drilling Company, et al., v. Siegal, et al*., 2009 U.S. App. Lexis 1297, *15 (10th Cir. 2009). Although purely speculative harm will not suffice, a showing of "significant risk of irreparable harm" sufficiently demonstrates that the harm is not speculative and satisfies the movant's burden in this regard. *Id.* Here, the irreparable harm to Heartland unless Respondent is enjoined from enforcing the revocation of its FFL such that it be permitted to continue normal business operations, including the acquisition and disposition of firearms, cannot reasonably be disputed because, without the injunction, there simply will be no business left to care about.

The overwhelming majority of Heartland's business income depends on its ability to sell firearms, and such literally drives virtually everything that goes on at the store, from the sale of ammunition, accessories, safety devices to all of the other accoutrements that accompany such.

Thus, without firearms, there simply is no business and everyone loses out. Accordingly, without the requested relief, Heartland will suffer irreparable harm up to and including the complete failure of its business, the loss of its employees' jobs, and harm to the public's rights, before this honorable Court has even had a chance to study and determine the merits of this case.

### III.    THE REQUESTED INJUNCTION CAUSES NO DAMAGE TO RESPONDENT.

Suspending the effectiveness of the Respondent's revocation of Heartland's FFL during the limited time needed to litigate this matter will inflict no monetary damage on Respondent or in any way threaten ATF's intangible interests. Heartland has continued in operations for nearly a year since ATF's inspections uncovered the alleged violations at issue, and in that time Heartland has implemented measures to ensure compliance and to avoid any repeat of the violations for which it was cited. Thus, it simply is not credible for Respondent to insist the Heartland be put out of business for the few more months it will take to present what will likely be a meritorious appeal of the Final Notice.

Accordingly, the requested injunction causes no harm to Respondent, but even if it did, any such harm resulting from a few-month delay in implementing his decision is substantially outweighed by the life-altering harm suffered by Heartland, its employees, and the public if the injunction does not issue.

### IV.    NOT ONLY WILL THE REQUESTED INJUNCTION NOT HARM THE PUBLIC'S INTEREST, IT WILL ACTUALLY HELP PROTECT SUCH INTEREST.

None of Respondent's actions throughout this matter indicate any great urgency to remedy any situation threatening public safety or the integrity of the federal regulatory scheme for firearms. None of the violations cited in the Final Notice have caused any direct threat to public safety (although, again, Heartland would never minimize even so-called "record-keeping"

or clerical errors), and the unique circumstances surrounding ATF's assumed "straw purchase" are built on nothing more than massive logical leaps and assumptions that merit actual evidence which ATF never bothered obtain.  The public has an interest in seeing that its laws are administered justly and with proper due process.

Moreover, Heartland's continued existence as a viable business will greater serve the public interest during these difficult economic times by maintaining jobs for the store's employees, so that they can continue to provide for themselves and their families.  While Respondent may not ascribe any particular significance to whether Heartland has an FFL or not, the company, its employees and their families, as well as the public as a whole, depend on such.  It also should not be minimized that Heartland serves the public interest and the Second Amendment by providing individuals with the opportunity to lawfully exercise their right to keep and bear arms. *See, District of Columbia v. Heller,* 128 S.Ct. at 2799.  A right that cannot be exercised is the equivalent of having no right at all. Accordingly, not only will the requested injunction not harm the public's interest, but its issuance will help further that interest.

**V.      THE COURT SHOULD NOT REQUIRE HEARTLAND TO POST SECURITY.**

Federal Rule of Civil Procedure 65(c) provides that a preliminary injunction shall not issue except upon the applicant providing such security as the Court deems "proper, for the payment of such costs and damages as may be incurred or suffered by any party who is found to have been wrongfully enjoined or restrained."  The amount of such security is left to the Court's discretion. *See,* Moore's Federal Practice 3D, § 65.50[1].  The Court has discretion to waive the requirements entirely in appropriate cases. *The Continuum Company, Inc. v. Incepts, Inc.*, 873 F.2d 801, 803 (5th Cir. 1989).  Here, there is no need to demand security from Heartland for the preliminary injunction because the Respondent represents a government agency, not a private

party or commercial business, and will suffer no harm while the TRO and preliminary injunction are pending. As discussed above, the balance of hardship entirely favors Heartland, and even if a TRO and preliminary injunction are improvidently granted, other than a delay of the effectiveness of his revocation of Heartland's FFL, no harm to Respondent of the type that can be secured will have resulted.

## CONCLUSION

Faced with the ATF's notice, Heartland must act to avoid the destruction of its business and all of the irreparable harm that such would bring, before the Court even has a chance to decide the merits of this matter. Absent granting the requested injunctive relief, Heartland faces ruin even if it prevails. Therefore, to allow for a meaningful review of the Final Notice and preserve the status quo and possibility of a more than Pyrrhic victory, this Court should enjoin Respondent from enforcing the revocation of its FFL such that it be permitted to continue normal business operations, including the acquisition and disposition of firearms, during the pendency of these proceedings:

> [If the government] is wrong and [petitioner] remains a viable concern, then allowing the suspension [of its license] to continue may kill it -- and the United States does not afford a damages remedy to firms put out of business by administrative high-handedness.

*See, Finer Foods, Inc. v U.S. Dept. of Agriculture*, 274 F.3d 1137, 1140 (7th Cir. 2001) (dealing with a similar situation concerning a license issued by the Department of Agriculture to operate as a dealer in certain commodities under federal law).

WHEREFORE, Heartland respectfully requests that this Court grant its motion for a temporary restraining order and preliminary injunction and also award any further relief deemed just and appropriate.

DATED: September 1, 2023

Respectfully submitted,


*/s Scott Nehrbass*
Scott Nehrbass, #16285
FOULSTON SIEFKIN LLP
7500 College Boulevard, Suite 1400
Overland Park, Kansas 66210-4041
Telephone: (913) 253-2144
Fax: (913) 498-2101
snehrbass@foulston.com

Jeff P. DeGraffenreid, #15694
FOULSTON SIEFKIN LLP
1551 N. Waterfront Pkwy, Suite 100
Wichita, KS 67206
Telephone: (316) 291-9788
Fax: (316) 267-6345
jdegraffenreid@foulston.com

Scott L. Braum (*pro hac vice* to be submitted)
*Email*: slb@braumrudd.com
Timothy R. Rudd (*pro hac vice* to be submitted)
*Email*: trr@braumrudd.com
SCOTT L. BRAUM & ASSOCIATES, LTD.
812 East Franklin Street, Suite C
Dayton, Ohio 45459
Telephone: (937) 396-0089
Fax: (937) 396-1046

ATTORNEYS FOR PETITIONER

**CERTIFICATE OF FILING AND SERVICE**

    Scott Nehrbass, an attorney, certifies that, on this 1st day of September 2023, he caused the foregoing to be filed via the ECF system for the United States District Court for the District of Kansas, and that a copy of said filing is also being served on all counsel of record via the Court's electronic notification system, electronic mail, and via hand delivery upon the Respondent.

                                                       */s Scott Nehrbass*
                                                       Scott Nehrbass