UNITED STATES DISTRICT COURT
DISTRICT OF KANSAS

HEARTLAND OUTDOOR, INC.,
doing business as Heartland Outdoor,

Plaintiff,

v.

WILLIAM J. MILLER, Director of Industry Operations Bureau of Alcohol, Tobacco, Firearms and Explosives

Defendant.

Case No. 23-1182

Kansas City, Kansas
Date: 9/15/2023

.....................................

# TRANSCRIPT OF MOTION HEARING HELD VIA ZOOM VIDEOCONFERENCE

BEFORE THE HONORABLE DANIEL D. CRABTREE
UNITED STATES DISTRICT COURT JUDGE

APPEARANCES:

For the Plaintiff:

Timothy R. Rudd
Scott L. Braum & Associates, Ltd.
812 E. Franklin Street
Suite C
Dayton, OH 45459

Scott C. Nehrbass
Jeff DeGraffenreid - Wichita
Foulston Siefkin LLP
7500 College Boulevard
Suite 1400
Overland Park, KS 66210

For the Defendant:

Sarah Burch Macke
United States Attorney's Office
1200 Epic Center
301 N. Main
Wichita, KS 67202

Jordan Bergus
Bureau of ATFE
1251 NW Briarcliff Parkway
Suite 600
Kansas City, MO 64116

Proceedings recorded by machine shorthand, transcript produced by computer-aided transcription.

# I N D E X


| | |
|---|---|
| Argument by Mr. Rudd | 10 |
| Argument by Ms. Macke | 28 |
| Rebuttal Argument by Mr. Rudd | 59 |

| Plaintiff's Witnesses: | Page |
|---|---|
| ROGER THEEDE | |
| Cross-Examination By Ms. Macke | 34 |
| Redirect Examination By Mr. Rudd | 60 |

(Court called to order.)

THE COURT: Good morning, everyone. Let's open the record. This is No. 23-1182. The caption of that case is *Heartland Outdoor, Inc. against William J. Miller, as Director of Industry Operations for the ATF*.

Let me just start by figuring out who's who in getting your appearances starting on the plaintiff's side of the caption.

MR. NEHRBASS: Good morning, Your Honor. Thank you for accommodating us this morning, and I know I express the sentiments of everyone that we hope you're healthy and well.

I'm Scott Nehrbass from the Foulston firm on behalf of the plaintiff -- I'm sorry, petitioner, Heartland Outdoor, Inc. And then also on behalf of petitioner you'll see on your screen Mr. Tim Rudd who's been admitted pro hac vice. Mr. Rudd will be the lead lawyer today for purposes of the hearing.

Also on behalf of petitioner, my colleague Jeff DeGraffenreid in our Wichita office. Seated beside him is Mr. Roger Theede who operates the store in Hutchinson and lives in Hutchinson, and also on behalf of -- as a corporate representative of the petitioner Mr. Steve Theede who owns the store and lives there.

And also I guess I should mention that I believe Mr. Roger Theede's son, Brent, drove him to our Wichita office from Hutchinson this morning and is in the room off camera if

that's okay, Your Honor.

THE COURT: It is. Thanks very much. All right. Good morning all of you.

And then on Mr. Miller's side of the caption I've been identifying as defendant, that's not the right term, forgive me, respondent Mr. Miller.

MS. MACKE: Your Honor, good morning. Sarah Macke on behalf of the respondent, and on the line I also have Jordan Bergus. He is my ATF agency counsel.

THE COURT: All right. Counsel, good morning.

This is -- and thank you all for accommodating the vagaries of kind of a Ground Hog Day revisit to the strains of the pandemic. It was not what I'd hoped for during my short trip to New Mexico, but the good news is I'm as well as I was before. I'm just serving out my time in the quarantine, so thanks for accommodating.

I regret we're not all together. I learned, during the pandemic, that the video medium is a good substitute for being able to get together in person, but it's not a perfect substitute, so I appreciate your flexibility. I really want get to your motion. I know the parties have substantial interests and rights at stake in the hearing.

Let me just share with you what I've done to try to get ready for you this morning and that way you'll know what I may have missed and may want to redirect me on some of that.

This is -- this hearing is noticed as a motion hearing on Document 4 in the case, that's the petitioner's motion for a temporary restraining order and preliminary injunction I've read as well the memorandum that goes along with that that's Document 5, and, of course, the verified complaint, Document 1.

From the defendant's side I've read your response filing -- or Docket 16 on the case and its attachments.

I'm also aware of the petitioner's submission of Mr. Norris's affidavit and notice of supplemental authority. Those are Documents 14 and 13.

And just this morning I noted the petitioner's reply that was filed last evening as Document 17. I don't want to aggrandize my efforts on that reply. I have read it on the screen, but I plan to reread it again as the issues unfold. And I hope the next time I'll have a hard copy in front of me so I can make notes on it, but I am aware that it is there.

Let me just encourage you, if you, in listening to that inventory of work, heard something or didn't hear something that you had hoped I would notice or focus on, that you bring that to my attention during the hearing. And I'm confident that we'll be going back and looking at the filings after we conclude our work together today, because I always learn things from being together.

Let me just make sure I understand the state of play in the case. As I understand things, the petitioner's federal

firearms license is still in effect, but absent from some future agreement or action by the court, the effective date of the putative revocation now is September 26th. Do I have that date correct, counsel?

MR. RUDD: Your Honor, you have the date correct. One clarification as to the status of the license. While the revocation is not effective, ATF -- the current status is that ATF has agreed to allow dispositions only, no acquisitions.

THE COURT: So there's no replenishment of inventory; you're entitled to sell down what you have?

MR. RUDD: That's correct.

THE COURT: Okay. Thanks very much.

Ms. Macke, do you have any additional input to clarify on where things stand?

MS. MACKE: No, I agree with that clarification, Your Honor, regarding they're allowed to sell what they currently have but not continue to acquire because they're not operating under a full license.

THE COURT: Very well, that -- that, I think, may prove informative of what we do today and where we leave things. We'll see how this goes.

Let me just look to the petitioner's side of the caption. And, Mr. Rudd, I'll look primarily to you since I -- you were forecast as the -- the point guard from your side. Tell me what you have in mind to do this morning.

MR. RUDD: Your Honor, my aim this morning is to present to you essentially the position of, one, give you clarification as to how this process of licensure and revocation and hearing works, because while that is something that I deal with every day, that might not be something that's necessarily come before this court often. And then having done that, my aim is to lay out to you the various factors that have to be determined in order for the court to issue a ruling.

Our aim is for the court to -- to issue a ruling allowing acquisitions and dispositions going forward through the pendency of this action, and obviously I would expect the next step would be to be a preliminary injunction hearing, but until then we would like a TRO prohibiting enforcement of the revocation.

THE COURT: Yeah, that's -- that's an interesting -- thank you. That's an interesting point you raise. This motion was filed in a combined form as a TRO and preliminary injunction matter. Tell me what -- in -- is it petitioner's view that we're only proceeding on the TRO portion of the motion today?

MR. RUDD: Your Honor, I have seen it happen a number of different ways. I'm happy to proceed on both. In a perfect world, I would -- if the TRO is not -- is issued and we're preparing for the case, I would -- I would imagine taking a deposition of the industry operations investigator and doing

very limited discovery before a preliminary injunction hearing. But obviously if -- if we need to proceed on both today, we could do that.

THE COURT: Yeah, I -- I don't know is the answer to your question. I know there was a request for immediacy from the petitioner's side of the caption. I wanted to be responsive to that.

I think in our circuit it's not necessarily consequential on what you refer to this hearing, because the standards seem to apply equally to both procedural increments. I do -- I do have some questions about where the case is headed procedurally, so we'll return to that issue maybe at the end of the hearing.

Ms. Macke, from your side of the caption, what do you envision doing today?

MS. MACKE: Your Honor, we were planning on proceeding as if this was the hearing on the motion for a TRO and preliminary injunction. I'm planning to hear what the petitioner has to say and then make the arguments on behalf of the respondent that the factors the court considers for granting a motion for a preliminary injunction or a TRO have not been met here, but I was planning on moving forward with the -- a full hearing.

The respondent would definitely be opposed to conducting discovery and then having another hearing and then

continuing with the review on the merits and getting into the substance of the case. It would be more appropriate to decide whether or not to enter a preliminary injunction here and then go ahead and move forward quickly with the review that's authorized by the statute.

THE COURT: Yeah, so we have about 11 days before the clock runs out on the limited license that your agent has left in place. I really don't know where this is headed today, and I don't know whether I will feel in position to rule both motions today or not. So I'm not going to -- I'm not going to tell you how I view this. I would just say to you, Mr. Rudd, that I would encourage you to put, in the time we have allowed, as much as you can out.

I mean, this is not an evidentiary -- this is not a rules of evidence proceeding, I'll say it that way. And I would encourage you to give me as much information, because whether we call it one or the other or both, I think there is a chance that we may have to reconvene before I'm ready to rule at least the PI portion of it.

But let me not waste any more time of yours. It's about 9:20. Counsel, I had planned to be with you through about 11:30 this morning. And obviously I want to hear from both sides, so I'd ask you to kind of plan your affairs accordingly. I'll keep an eye on the clock.

Mr. Rudd, you're going to get to go first and then I

want to hear from the respondent once you're finished. So with that background, Mr. Rudd, I'll give you control of the microphone and let you dictate the course of the next hour or so.

MR. RUDD: Thank you, Your Honor.

So just for -- by way of background, federal firearms licensees have a -- have a right, upon issuance of a notice of revocation, to request a hearing. Notice of revocation is something that's going to come about in some instances after an inspection, what's called a compliance inspection that ATF will do.

Exhibit B to the reply memorandum that was submitted last night as the 2022 ATF data, that shows that they do somewhere around -- they did somewhere around 6,900 compliance inspections in fiscal year '22. Of those, roughly half there were violations that were found, and that document also lists the most common violations, for example, acquisition and disposition of records.

And, Your Honor, if you have any questions about any of the terms I'm using, please stop me and I'll explain. But basically there's a book that you're permitted -- required to keep as a licensee. On one side it has guns acquired and on the other side it has guns disposed of, and those are kept for the duration of the license. And so if you have a 15-year -- 15-year history, you've got 15 years in your books. And so,

you know, 15 violations would be about one a year. What we see is around the country there were over 33,000 A&D violations.

So what happens is ATF does a compliance inspection and issues a report of violations when they find them, which as you see from Exhibit B to the reply is on about half of the inspections, over 3,000 inspections in 2022.

Depending upon the nature and the character of those violations, ATF makes a determination -- initial determination of whether they believe they were willful. And that's essential because the statute -- the Gun Control Act was revised in 1986 with the Firearms Owners Protection Act to add the word willful before a violation in terms of what ATF is allowed to do in terms of revocation.

If ATF finds violations, they can either issue a notice or report of violations. Then they can, in some instances, have a warning conference or send a warning letter. In the most egregious of circumstances, they will issue a notice of revocation. A notice of revocation was issued here.

Once that revocation notice is issued, the licensee is allowed to request a hearing. In this particular instance, and in all other hearings, ATF represents that they are informal proceedings. And they are informal in that they're not governed by the rules of evidence, they do not have subpoena powers, they do not have any -- any way to compel witness attendance. They're informal in that way, but they're quite

formal in the fact that they begin with opening and closing statements, they have attorneys, they have exhibits, they have a hearing officer, and the outcome can be a revocation such as what we have here.

In this instance, Heartland Outdoors appeared for an informal hearing without any attorney and ended up not being able to have the type of representation that it could have had and, frankly, should have had. My personal opinion, Your Honor, based upon 20 years of experience of doing these literally all over the country, had Heartland Outdoor been represented by counsel, we wouldn't be here. I'll explain why here in a moment.

Once that notice of revocation has been issued and a hearing has been requested, the law says that the licensee gets to continue in operation acquisitions and dispositions during the pendency of the hearing process until a final notice of issuance -- revocation is issued. Here there was a final notice. And the law says we get 60 days to ask for a *de novo* judicial review, which is what we have done.

This court's role is to look at the evidence and determine not whether there was a violation, as there are on almost half of the inspections that are conducted around the country every year, but whether there was a willful violation. The language that the courts have used for willful violation is language such as reckless, plain indifference, knowingly,

intentionally. The case law is very clear, which is why you'll notice in our initial memorandum we have a chart full of cases that identify when ATF has upheld revocations. Usually there's --

THE COURT: Can I interrupt you just long enough --

MR. RUDD: Yes, sir.

THE COURT: -- long enough to ask, and I saw various courts in various regions in the country, including circuits, have taken their effort at this willfulness word. I see my circuit has weighed in on it --

MR. RUDD: Yes.

THE COURT: -- in the *CEW Properties* case. And it appears to me, at least, that whatever the merits of other courts' treatment of that term, that I'm obliged to follow the guidance from the circuit in Kansas -- the circuit for Kansas. Do you agree with that?

MR. RUDD: Certainly. I certainly agree with that, Your Honor, although -- although I would argue the plain indifference language used in -- in the Tenth Circuit certainly means something more than just the mere existence of the violation. It requires a showing, requires evidence. And so when courts have upheld ATF revocations, they have looked to see, well, what is the history, what are the circumstances here.

In this instance, there is the history of 16 years of

perfection, no reports of violation in multiple inspections. The most recent inspection had a handful. And, Your Honor, I'm -- I'm never -- I'm a compliance lawyer. I train people on this. I don't minimize any violations, but literally a handful of them, most common violations. And it's important to understand that -- that licensees are not held to a standard of perfection.

And so I have to ask myself: Why are we here? And in my experience, the reason why we're here is that the knowing participation in a straw sale will usually get a licensee in some serious trouble except when we look at the evidence here. ATF made assumptions that there was a straw sale. ATF made assumptions that we were taking an expired license. And so when -- when the large and most significant violation, the one that gets you revoked is taken out of the equation, they're left with -- with something that typically wouldn't even merit a warning letter, let alone a warning conference, and absolutely no evidence of plain indifference other than the mere existence of the violations themselves.

So, Your Honor, when we consider this question of indifference, we have to look for evidence of indifference. Obviously willful has to mean something in the statute, otherwise there's no reason for it to be there.

ATF has and courts have upheld revocations without any warning on a first inspection; that's true. Although, Your

Honor, I would have you look at the six cases cited by ATF in favor of that, they're -- they're nothing like this, and I can tell you that because two of them are mine.

When I look at these cases, in one instance you have someone -- it's not that they went through 15 years of acquisition and disposition records and found 18 mistakes out of literally thousands -- tens of thousands of guns. Instead, in those cases, they didn't even have a book of acquisition of disposition records to look through. In one instance you have "didn't keep an A&D book at all" for 15 years. In another instance you have "didn't keep an A&D book at all" for three years.

I've given you a reply chart in my memorandum, Your Honor, that lays out what ATF is looking for and what the courts have looked at to uphold a revocation and a determination of willfulness in a case where you've had a no prior adverse action. This isn't that.

What we have is we have ATF saying that, "Well, you've got a straw purchase." We disagree. Had I been involved at the hearing level, I would have brought the affidavit of Mr. Norris and I would have asked the IOI, "Had you even talked to the person when he walked out of the store to see if the gun was for him or someone else?" And he would have said, "No," because he didn't. And I would have brought Mr. Norris's affidavit and said, "The gun's been with him. His wife didn't

even have access to it."

ATF assumed there was a straw purchase. There wasn't. Both as a matter of fact and as a matter of law, we have an individual whose wife was going to get him the Christmas present he wanted who could just as easily have given him cash, could just as easily have given him a gift card, could just as easily have -- have given him a -- a money order and said, "Go get the gun you want." There's not -- there's not a -- there's not a field division in America that, knowing the full facts on that and knowing that the man who walked out of the -- of the gun store with the gun, would assume that that's just a straw purchase.

Your Honor, I've -- I've seen ATF in other field divisions claim a straw purchase, and then after a hearing where evidence such as this affidavit was presented withdraw their claim. I've -- I've personally sat through it. Unfortunately, instead of doing that at the field office level, we're doing it at this level.

Another one counsel, in the response memorandum, asked why we didn't address the other violations. Well, I think we did. And -- and the response to that is the number of those violations and the nature of them, given that they're the most common violations in the country by ATF's own admission without anything more, doesn't give anyone any basis to conclude willfulness.

One was particularly egregious. In the reply memorandum, I addressed it. There was a question and answer, I think it was on page 127 of the transcript, where the claim was that we were taking -- that we were -- that we had false information regarding the expiration date of an ID. And ATF's interaction from the -- the question being asked to the IOI was simply, "That can't possibly be right, can it, it expires in 2061?" And the answer to that, "Well, of course it can't possibly be right." Except if you go pull the Arizona statute, it is right. The Arizona law says that -- that the expiration date is the 65th birthday of the individual, and in this case it was the 65th birthday of the individual.

Your Honor, this -- these types of claims for violations -- one, whether there's any violation at all, they have to be tested against reality, and they never have been. To the extent that there is a violation, it's ATF's burden to show that they're willful.

Your Honor, I would posit to you that when it comes to the question before the court today, we have a licensee who is getting his day in court. And so the court has to decide, when this licensee avails itself of the judicial review process, will it be of any benefit. Because if the court does not allow this licensee to remain in business, the business will not remain in business.

I brought Roger Theede with me today. He can provide

evidence. And I would -- I would like eventually to ask him to -- to tell the court what happens, based upon their own internal estimates of -- of the profitability of this company, if gun sales are taken away. We've looked backwards. In 2022 without the sale of guns, the estimate of this store and the livelihood of the people who work there is that the store would have lost over a hundred thousand dollars in 2022. The estimate --

Your Honor, it's -- just so I can put it on the record since we're not dealing with the rules of evidence, can I ask Mr. Theede to confirm whether that's accurate?

THE COURT: You can, yes.

MR. RUDD: Mr. Theede, is that accurate?

MR. ROGER THEEDE: That's correct.

MR. RUDD: If -- are the estimates the same that for 2023 without gun sales the store loses over a hundred thousand dollars?

MR. ROGER THEEDE: Yes, that's true.

MR. RUDD: Is there any reason to see change in what happens in this store without the sale of firearms in the years going forward?

MR. ROGER THEEDE: No.

MR. RUDD: Will the store continue to exist if it loses a hundred thousand dollars a year?

MR. ROGER THEEDE: No.

MR. RUDD: Okay. Thank you.

So, Your Honor, we have to balance four factors.

Factor number one is the likelihood of success. Your Honor, when you look at these facts, especially in view of what other courts have done, the Paducah case recently that I forwarded to you that was filed as supplemental authority, the case up in Minnesota not too long ago, even -- even the -- even the Western District of Missouri in the St. Joe -- with the *Web Guy Enterprises* case, which is also known as St. Joe Guns, Your Honor, these facts are far and away more favorable to the licensee than any of those cases where the courts have issued injunctions.

THE COURT: Yeah, I mean -- I mean, in some respects it's probably not a model of process for the hearing officer at a case to be the husband of the counsel, so I think Judge Magnuson's case up there was on a pretty unusual set of due process facts.

MR. RUDD: Yeah, the Hummels (phonetic) are good people by the way, but that one was unique in that regard.

But the Paducah case and the *Web Guy Enterprises* case, Your Honor, you can't even -- you can't even really compare the facts in those. We have -- we have a pristine record for a decade-and-a-half.

So we look at the likelihood of success. ATF is not going to be able to show Heartland Outdoor made an illegal

straw purchase because it didn't. ATF is going to be able to show a handful of the most common violations. And it's not going to be able to show any evidence of willfulness other than the fact violations occurred, and that's not sufficient anywhere. And so the evidence that the -- that ATF has is they have the hearing transcript. That's what we have. And so, Your Honor, when it comes to likelihood of success, I believe that that weighs heavily in favor of Heartland Outdoor.

Irreparable harm: Irreparable harm does not have to be devastating harm. Frankly, if Mr. Theede said, hey, you know what, we won't go under but it would hurt us, that -- unless we have a remedy of law to -- to be compensated should we be found to be right here, that harm, even if it's not devastating, is irreparable.

In this case we got a government defendant. Unless the ATF is willing to say that Heartland Outdoor -- if we are found to have not willfully violated the Gun Control Act, that Heartland Outdoor can come after the United States of America and be made whole for the harm that befalls it, unless the U.S. is willing to concede that, and I'm pretty sure they're not, I believe that we very clearly have shown irreparable harm.

It is without question that for a gun store to no longer be able to engage in the business of acquiring and selling guns, which drives all of their other business, they're going to be harmed. In this case Mr. Theede has said it's

going to put them out of business. So irreparable harm we don't think really is a question.

The question of whether the injury to Heartland outweighs the injury to the government, this is -- this is a difficult one to discuss because I'm not sure what the injury to the government is. Frankly, I'll probably wait to address that on the reply. Because I've racked my brain, I don't know how the government is injured by allowing Heartland Outdoor to continue in operations.

That's especially true given that this inspection was from June of '22. Heartland Outdoor has been in operations up until they ceased allowing acquisitions for over a year. This is not a case where we have a menace to society gun dealer that is breaking the law and putting people in harm's way. If that were the case, we would have criminal issues involved and we wouldn't be here. It would have -- it would have -- the license would have been taken a long time ago for other reasons.

Your Honor, I don't know what the harm to the government is, but the harm to Heartland Outdoor outweighs it.

The question of the fourth factor, whether the injunction adversely affects the public interest, again, I don't -- I don't see how we can say that it does. One of the things that ATF uses these documents for, the things -- the paperwork that -- that these violations all surround is to be

able to trace firearms, to aid in law enforcement, and to be able to go after bad people who do bad things with guns, to be able to prove ownership, to be able to prove possession, to be able to prove any number of things. Heartland Outdoor has never been -- failed to be able to answer a trace based upon its paperwork. There's no evidence of Heartland Outdoor doing anything that would jeopardize public safety.

But what Heartland Outdoor does is it provides a means for people to exercise their Second Amendment rights. It provides a means of business competition in the community, and it is an active member of the marketplace that employs people that helps the local economy. And so, Your Honor, I don't -- I don't see any way in which the issuance of an injunction would adversely affect the public. I can see in many ways in which the failure to issue the injunction would.

And so I would point you to the affidavits, the affidavit of Mr. Theede that lays out the history of this company. I would point you to the transcript and the excerpts that have been submitted. That while they contain acknowledgements of errors, and there are errors, the standard's not perfection. They contain no evidence of willfulness.

What ATF has used -- except in the most egregious cases like the six that are cited by ATF in their response memo, what ATF has used in the past, when there's no direct

evidence of willfulness, is the inference of willfulness because of multiple repeat violations. That's what they've used to build that -- to build that case. It's not direct evidence but it's -- it's something.

Here we don't have that something. There's a chart of cases in our initial memorandum that lays out what courts have looked at, what ATF has looked at. I genuinely believe that but for the sale to Mr. Norris, we're not even here. And I genuinely believe that based upon 20 years of being involved in license reviews, license inspections, and hearings.

I wish there was a way short of -- short of having an expert witness who's worked with ATF, and I -- I can get one, a former DIO who retired after this inspection was done, to -- to put forth how far afield this revocation is from literally anything I've ever seen.

So I'd ask the court -- given these circumstances, the complete lack of prior revocation history, given the very clear errors and failure to even investigate before making assumptions that ATF made, I would ask the court that the court not leave Heartland Outdoor with the best hope of a Pyrrhic victory.

Absent issuance of an injunction, Heartland Outdoor gets an order that's successful in this case that says ATF was wrong, except Heartland Outdoor's out of business and that's irreparable. And this type of proceeding is designed to

allow -- for people like Heartland to actually reap the benefits to the judicial review process for which they're entitled. So we would ask the court to issue both a TRO and a preliminary injunction. I personally believe that the court can, on the record before it, issue a preliminary injunction today.

Ultimately, before the court ultimately rules on the merits of this case, which will, I'm sure, be on summary judgment, because it's a *de novo* review before the court, I would expect that I would get a chance -- a fresh chance for me to depose the IOI, the industry operations investigator, to dig into how ATF reached its determination of willfulness. But it has to be something more than -- other than just, well, there were violations, we're going to presume they're willful.

THE COURT: Let me -- I don't -- I don't want to interrupt you. You may be moving to a new topic or you may be winding down.

MR. RUDD: I am wound down, Your Honor.

THE COURT: I thought I was reading -- it's -- it's a little more challenging in different places to read that, but that's the way I perceived it.

Let me just ask: If you were to get the interim relief that the petitioner is seeking, as I perceive it you're asking the court to keep things where they are, and I -- is that too narrow?

MR. RUDD: That is too narrow, Your Honor.

THE COURT: All right. Straighten me out.

MR. RUDD: Our request -- FFLs do not last long if they cannot get inventory. We found that out. Basic, various market circumstances over the years have made that really clear. And there was actually a time a couple years back when gun sales around the country were so high that gun dealers were going out of business because all the big stores got all the inventory and met the market and the smaller -- smaller dealers couldn't. And so, no, gun dealers do not last if they can't acquire guns to sell, and so we -- we would ask that the court, based upon this record, stay the revocation of the license pending judicial review.

Counsel mentioned something earlier in just our brief introductions, and I'm not sure that it was -- that it was meant to be spoken with precision. But the statement was made, -- and -- and I'm paraphrasing, that Heartland is not operating under a full license. Your Honor, there -- there aren't two kinds of licenses. ATF does not issue disposition only licenses. And so for -- for Heartland to not be harmed, the only -- the only proper result is for the stay of its FFL revocation to be put in place through the end of judicial review, which would mean that it gets to operate as an FFL as it has for over a year until recently since the inspection, and so that's what we would ask.

THE COURT: Yeah, and I didn't -- I've gotta a timeline I've made from my notes here, and it may be an appropriate time to try to make sure that I have the basic facts about that timeline right. So the final notice from the bureau was issued in -- looks like July 20th. Do I have that right --

MR. RUDD: That sounds right. That's right.

THE COURT: -- or close enough for this discussion?

And is that when it became a disposition only sort of grace going forward or am I wrong about that.

MR. RUDD: No, Your Honor, I believe it was -- it was initially 15 days -- and I don't have it in front of me right now, but I believe it was 15 days after receipt of the notice or after issuance of the notice it would become -- it would be revoked. Then there was correspondence -- and this was all before me. Then there was correspondence and ATF said, "Well, you can do dispositions only through September 11th," and there was no correspondence "and you could do dispositions only through the current deadline."

THE COURT: All right. And I think I -- I mean, I don't -- I used to hate it when judges would start trying to predict the parties' position, but here I go. I can -- I can almost hear Ms. Macke warming up to say the petitioner is asking for a TRO that not -- doesn't just maintain the status quo, that changes the status quo. And those are disfavored in

our circuit. What's your view of that issue?

MR. RUDD: My view of that issue is that the status quo should be calculated. This is -- this is a dispute over the revocation of a license. Before the revocation, Heartland Outdoor had a license. Subsequent to the revocation, Heartland Outdoor at some point doesn't have a license. The concessions in the meantime are immaterial.

And so our position would be that given that there is no quasi-license that ATF issues, the judicial review process necessarily, if there is a stay, would put the position of -- put Heartland Outdoor in the position of having a license, which is -- which is what the court in Paducah did, which is what the court in *Web Guy Enterprises* did, which is what the court in Minnesota did, but there were other factors there.

THE COURT: I was afraid we were going to get to this metaphysical discussion about what the last peaceable moment is before the status quo, and I feel -- at that point I feel like I have to go back to a college philosophy class.

MR. RUDD: That's a good question.

THE COURT: It looks like we're headed there despite I hoped we could avoid it. Mr. Rudd, I appreciate your discussion.

Ms. Macke, let me clean up my notes before I turn the microphone over to you.

All right. Thanks very much. Somehow, Ms. Macke,

Mr. Rudd managed to measure his presentation to last exactly as long before my computer logs out on its own, so I had to get back into it. I'm back, I'm ready to hear from respondent on that. Ms. Macke, I'll look to you on that.

MS. MACKE: Thank you, judge. And before I think you came on the line, there was a question of whether or not I was talking loud enough. I moved the phone closer. If at any point you can't hear me, please let me know; I'll try to speak up.

THE COURT: You're doing great. Thank you. I can hear you well.

MS. MACKE: Thank you. And -- all right. As Your Honor mentioned at the beginning of this -- of this hearing, the standard in the Tenth Circuit for a TRO in a preliminary injunction is basically the same, it's the same four factors. The court is obviously familiar with those four factors. The couple of permutations I would note that are at issue in this case are:

1. The status quo. And a change in the status quo is a disfavored preliminary injunction, and so the movant has to show a heightened burden.

And then the second one is when the government is a party.

The third and fourth factors essentially merge into one, and so that's how I'll analyze it as we go forward.

THE COURT: Let me just ask about that. Can I just -- because I had some notes about this, I thought it might become an issue. And so are you referenced -- so there is this discussion about this modified standard that sometimes arises under that *RTC* case back from the early '90s, and then there is something from the circuit. I think it comes from the Heideman decision, H-E-I-D-M-A-N, that talks about the modified standard doesn't apply when the TRO, or PI as the case may be, would stay governmental action that is taken in the name of public interest under a statutory regulatory scheme. Is that what you're referencing or are you referencing something separate from that?

MS. MACKE: Is that regard to the merging of the factors or --

THE COURT: I don't -- I don't know. I don't recall it saying that. I don't want to stop things here and go back and look at it, but I thought maybe you were referring to that. It sounds like maybe you were referring to another case. If you want to cite that, I'll catch up and read it later.

MS. MACKE: Okay. With regard to the -- the factors merging, three and four merging --

THE COURT: Yes.

MS. MACKE: -- I was referring to the -- I don't know how to pronounce it, but *N-K-E-N v. Holder*, Supreme Court case. And then with regard to the specifically disfavored

permutation, when you're looking to change the status quo, that's the *Schrier v. University of Colorado*, Tenth Circuit, decision.

THE COURT: Those are both cited in your papers?

MS. MACKE: Yes, they are. They're cited in the legal standard section of the -- our up front brief.

THE COURT: Thank you very much.

MS. MACKE: And I think, as the petitioner recognizes, the petitioner bears the burden to establish that the preliminary injunction or TRO factors are satisfied in order to obtain the relief requested. Petitioner can't meet that burden here, so I'll jump into the factors.

I'm going to talk about irreparable harm first, but actually there was one thing I wanted to note before I get into the factors. A couple of different times this morning counsel for petitioner noted a, you know, 16 years of a perfect history noted over -- that, you know, there is a handful of violations over a 15-year period. But I wanted to note that the compliance period for the inspection in this case was just one year. So the investigator was not going back to 2006 or even to 2018 in this inspection. They were looking at a one-year period from June 2021 to June 2022. So I wanted to just make sure that that was clear with regard to the inspection period.

But now jumping into the irreparable harm analysis, the petitioner bears the burden to show that irreparable harm

is present. And in the Tenth Circuit irreparable harm is generally kind of the first touchstone of the analysis. And courts have recognized that the harm needs to be more than just a serious harm. It needs to be irreparable.

The filings leading up to this morning include only conclusory and vague allegations of harm. There was no discussion of profits or revenues. And I would say that what was put forth in those clearly fails to meet the necessary burden to show that there is irreparable harm.

Counsel referred to the petitioner as a gun store numerous times, but this store has an extensive amount of inventory that are not firearms. And so I think it makes it more difficult in this case to just say, well, obviously if they lose their license they're going to go under, because they don't just sell firearms. And so I think that they do need to make more of a showing than just say obviously if we lose our license we are going to go under.

This morning is the first time that I heard anything about an estimate of losses. I don't know that the court will allow me or counsel to want me to cross-examine Mr. Theede on that but --

THE COURT: I certainly -- I certainly would if you think it is pertinent to the discussion this morning.

And, Mr. Rudd, do you object to that? You're muted.

MR. RUDD: No, I don't object to that. I would ask

that perhaps on -- in my reply time that I would be able to speak to both Roger and Steve Theede as well, because I know Steve was involved in the calculation of that number.

THE COURT: So, as I said before, this wasn't an evidentiary proceeding. You would like to question Mr. Theede now; is that right, Ms. Macke?

MS. MACKE: This is the first time that I've been presented with anything that is a hard number, and I think that on their briefing alone they have clearly failed to meet their irreparable harm standard. And I -- and maybe the court disagrees and you can tell me I'm wasting my time to cross-examine, but, no, I do have questions as to how that $100,000 number was calculated.

THE COURT: Yeah, I -- I don't know that I'm ready to grade the adequacy of the submission on the papers. As you heard, I've read the papers trying to keep up with you all, but I'm not sure whether I'm ready to assign a passing or failing grade.

The petitioner did present limited testimony this morning, although now I recall it was not under oath. I'm certainly going to permit you to question him in -- on that limited issue that was the subject of that if you'd like to do so. Do you wish to do so now or is that something you want to do later?

MS. MACKE: I mean, I'm happy to go ahead and do so

now.

THE COURT: All right. And, Mr. -- is it Theede or Theede?

MR. ROGER THEEDE: H is silent.

THE COURT: Say it again.

MR. ROGER THEEDE: Theede.

THE COURT: I'm sorry. Thanks. I wasn't sure I could hear it.

Mr. Theede, I'm going to ask you now to raise your right hand to accept the oath from the deputy clerk.

Ms. Garrett, please.

ROGER THEEDE,

called as a witness on behalf of the Petitioner, having first been duly sworn, testified as follows:

THE COURT: We're not able to hear you, Mr. Theede. Thank you. You might get closer to the microphone since you're going to be talking.

THE WITNESS: Is that better?

THE COURT: Yes, sir. Thank you.

Mr. Theede, I just want to ask -- first of all, would you just say your name for us.

THE WITNESS: Roger Theede.

THE COURT: And, Mr. Theede, earlier in the hearing Mr. Rudd asked you some questions. I -- I neglected, because it was an informal Q&A at that point, to apply the oath to you.

Now I've applied it to you, the testimony you gave -- or the answers you gave earlier, are they equally true now that you're under oath?

THE WITNESS: Yes.

THE COURT: All right. Thank you.

Ms. Macke, please, on this limited issue, you may inquire.

CROSS-EXAMINATION

BY MS. MACKE:

Q. Good morning, Mr. Theede.

A. Good morning.

Q. My first question is were you involved in the calculation of that $100,000 number we heard earlier?

A. No, my brother Steve was; he owns the store.

Q. Are you familiar --

A. I had the --

Q. -- with how -- go ahead.

A. No, go ahead.

Q. Are you familiar with how that number was calculated?

A. Yes.

Q. All right. My first question for you is we heard would have lost over $100,000. Is that you would have lost $100,000 in total sales?

A. Without gun sales. In 2022 with gun sales, we would have profited $39,659. In 2022 without gun sales, we would have

lost 100,131 dollars -- thousand -- one -- $100,131 without gun sales, and that's pre-tax.

Q. Thank you, Mr. Theede -- Theede, my apologies.

Mr. Theede, you, or maybe your counsel, mentioned that some of your sales are generated from foot traffic because you have an FFL; is that correct?

A. That's correct.

Q. In that $100,000 number you just stated, does that include lost foot traffic sales?

A. No, that's strictly sales of guns. I mean, guns drives the whole business.

Q. All right.

MS. MACKE: I don't think I have any other questions on that. Thank you.

THE COURT: And, Mr. Rudd, if you want to follow up on those questions, I'll -- we'll come back to you in your rebuttable time and you can address them if you choose.

Go ahead, Ms. Macke.

We've lost your audio somehow.

MS. MACKE: I'm sorry, I accidentally hit the mute on my phone itself.

THE COURT: You're back.

MS. MACKE: All right. Thank you.

Now -- with regard to the irreparable harm aspect, now we've heard some testimony, but I think there are a few other

factors that weigh into this analysis. First, if the -- even though -- even if the revocation is completely in effect, the petitioner is still legally allowed to consign those firearms that it still has in stock with another FFL so they are not wholly without an ability to -- to sell those and dispose of them.

And then there are some cases that recognize, in a preliminary injunction context, including in the context of an FFL revocation proceeding, that if the harm is self-inflicted, then it cannot be irreparable harm -- or it does not satisfy the standard for irreparable harm.

Here, aside from now seemingly two of the eight violations at issue, there doesn't appear to be any dispute that the petitioner violated the Gun Control Act in its implementing regulations, and so we are only here today because there are those prior violations. I understand that the petitioner claims they were not willful, but I think the factor means that there were definitively violations at issue here.

With regard to the likelihood of success on the merits, the Gun Control Act is intended to help law enforcement, and but it has another purpose too, and that's also to prevent prohibited individuals from obtaining firearms. And anyone that's -- that wants to engage in the business of dealing in firearms, they have to obtain an FFL and they have to maintain the necessary records relating to those firearms.

And if an FFL willfully violates any single provision of the Gun Control Act or its implementing regulation, the ATF is authorized to revoke its license.

Now, the Gun Control Act provides a review procedure for when a license has been revoked, and the FFL can seek a *de novo* review in this court. But as the Tenth Circuit and as other courts have recognized, this is a narrow review. The question before the court is not would I have exercised my discretion to revoke the license on these facts, but the question is was ATF authorized to revoke the license. And ATF is authorized to revoke the license if there's sufficient evidence to conclude that the petitioner engaged in one willful violation of the GCA.

And we spoke about willfulness a little bit earlier and the Tenth Circuit has spoken on this. And in the context of a revocation of an FFL, the Tenth Circuit has clarified that to meet that willful standard the FFL must have known of its legal obligations and been plainly indifferent to those legal obligations.

Earlier I believe counsel mentioned something about you can either be plainly indifferent, reckless or intentional or knowingly, but to the -- I don't -- I don't know that counsel was trying to say this at all, and I'm not accusing you of doing so, but to the extent it may have sounded as if plainly indifferent means intentional or knowing, those are

three kind of separate terms.

So plain -- obviously if someone is intentionally falsifying records, that's going to meet the standard, but you don't have to have an intentional purposeful kind of what people call the bad actor *mens rea* here. Plainly indifferent is sufficient to meet the willful standard.

And I believe counsel mentioned something about direct evidence and indirect evidence. The Tenth Circuit has recognized that in this context it's going to be rare to have direct evidence of a willful violation, and so of course these willful violations are proven by circumstantial evidence.

The Tenth Circuit has recognized numerous different types of evidence that can constitute circumstantial evidence that includes training that the FFL received from the ATF, both in the initial inspection when they get their license as well as during subsequent compliance inspections.

Another thing that courts have recognized is periodic compliance by the FFL. That an FFL met its obligations on some occasions supports the conclusion that the FFL knew of those obligations. And so then a subsequent failure to comply, the FFL can't necessarily claim I didn't have knowledge of this because they'd previously complied with it.

The length of time that a licensee has held its license is also a factor. The longer a dealer has been in business the more likely it is to know those obligations that

it has, and repeated failures to comply with its obligations is circumstantial evidence of willfulness.

Of course the magnitude of the violations in question is circumstantial evidence, and then statements that the responsible parties or others make to the investigators in conjunction with these compliance inspections.

Now, before I kind of jump into the facts of this case, I wanted to note a couple of things regarding the record. Mr. Rudd mentioned the acquisition and disposition records. That is one record that is required to be kept, and it must record every single transaction.

The other record that is required for every single firearms transaction is the ATF Form 4473, the firearms transaction record. At the time applicable for the inspection window, this was a six-page form. The first two-and-a-half pages of the form are completed both by the transferor, or the FFL, and the transferee, the purchaser. There's different sections for each to complete. And then the other three-and-a-half pages are instructions on how to complete the form. I understand that these are the primary two records, that A&D log and this Form 4473, that are required for every firearm transaction.

There's a third common record that's also at issue in this case, and that's the ATF Form 3310.4 -- and I promise I won't throw any more form numbers at you right now -- and that

-- that is the form for a report of multiple sale or other disposition of pistols and revolvers. That's the name of the form. And basically this is the two-page form that FFLs are required to submit when there are multiple sales of handguns within five business days. The first page of the form is the blank that is filled out by the FFL, and then the second page includes instructions.

With regard to this specific requirement, under the Gun Control Act in its implementing regulation, if an FFL sells more than -- well, sells two or more handguns to the same person within five business days, they're required to report that. And the requirement is that they report it by the close of business on the day that the multiple sale occurred.

So, for example, if on Monday a purchaser comes in and buys three pistols, the FFL is required to report that by the close of business Monday.

Another example is if on Monday a purchaser comes in and buys one handgun and then they come back on Wednesday and buy a second handgun, on Wednesday by the close of business the FFL has to report that because it's within five business days they've purchased two handguns. Does that make sense?

THE COURT: It does.

MS. MACKE: Okay. And so the purpose of this is to assist law enforcement in identifying criminal activity. And when FFLs don't timely report these or they don't report them

at all, that thwarts law enforcement.

So those are -- I wanted to give you an overview of some of the records that are at issue in this case.

THE COURT: Thank you.

MS. MACKE: So going to the merits of this case, as I mentioned before, this was a compliance review or a compliance inspection that started in June 2022 that covered a one-year period immediately preceding the start of the inspection. And ATF, in conjunction with this inspection, found numerous violations of the Gun Control Act in its implementing regulations.

I would note that these violations that were found, not all of them made it into the final notice of revocation, and in some instances -- so, for example, with the A&D log, that book they're required to keep, initially there were far more than the either 18 or 16 violations that were -- 16 that were ultimately included in the final notice of revocation at the point where the report of violation was issued, which is before the final -- or the notice of revocation there were about 43 handguns that still hadn't been accounted for since the inspection had begun.

But to kind of summarize the violations that were included in the notice of revocation, these include numerous instances where the petitioner failed to timely report the multiple sale of handguns or, in a couple instances, failed to

report them at all. Numerous instances where the petitioner failed to timely record the disposition of firearms on that A&D acquisition and disposition record leaving those guns unaccounted for. And at the time of the hearing, I believe Mr. Theede testified that one of the 16 guns that was listed on the notice of revocation had been located, but there were still missing 15 firearms.

The other violations included a failure to report a firearm lost or stolen, transferring a firearm to an unlicensed person without contacting the National Instant Criminal Background Check System that's known as NICS. That's the background check that's performed in conjunction with the sale. And so petitioner had failed to conduct that on someone who was required to have that conducted.

I know that petitioner is challenging the factual basis for the sale in December 2021 to the -- the Norris sale, but that was one of the violations noted.

And then the other three violations included failing to record mandatory information from the NICS checks. So when the background checks was completed, failing to include the information that's required to be included on the firearm transactions record, and then failing to properly record or verify a purchaser's identification on several occasions, and then failing to obtain complete or accurate information from a purchaser relating to questions on whether or not that

purchaser is a prohibited person.

And so on the form, I believe it's Item 21, there are numerous questions that the purchaser is required to answer, and those questions are essentially asking whether or not the purchaser is a prohibited person. And the FFL is required to review their answers. And if they answer yes, then the sale should stop. And if they don't answer it, then obviously they haven't completed -- the purchaser hasn't completed the sections they are required to, and they have to answer those questions.

Now, with regard to the merits, I want to just touch briefly on the Norris transaction in December of 2021. The petitioner spent a lot of time talking about that in its briefing. And, again, I would note that counsel's view of this particular transaction as the impetus for revocation is completely irrelevant. The petitioner doesn't get to decide what is grounds for revocation and what is not. There is plenty of other violations at issue here even without that for the revocation, and so I guess focusing on that is kind of a red herring. We still have seven other violations.

And I have not had an opportunity to dig into Arizona law. I take counsel's representations that at least some licenses are allowed to be effective until they're 65. I think that there are other exceptions. I haven't dug into that, so I'll set that one aside as well.

But the other six violations and the other instances where identification was not properly recorded in that seventh violation, those are serious and substantial violations. And the ATF decision here is not simply based on, well, you -- you knew your requirements and there was a violation. There are other -- there's other evidence as well which is note -- or circumstantial evidence which is noted in the decision of the director, and that includes the fact that the petitioner had shown that they knew how to -- they knew their obligation. They've complied with them in the past. They've had an FFL for a long period of time. The director did not find the petitioner's statements at the hearing compelling or explanations, and he found that this -- the petitioner's responses to some of these allegations further supported a finding of willfulness.

And I specifically wanted to note on that Norris one, I meant to say this earlier, the investigator testified that when he first brought up this transaction to the petitioner, the petitioner did not have an explanation. And so, you know, the director ultimately, after hearing all of the evidence, did not find the petitioner's testimony on that compelling and found the violation.

In our briefing we go through in a little bit more detail kind of each one of these ongoing violations, so I don't want to repeat what's in my brief. But at the end of the day

the ATF, there's no dispute that at least 58 of the violations that are included in this notice of violation are actual violations, and they're serious and substantial violations of the Gun Control Act, which is meant to keep guns out of the hands of people that they shouldn't be in and help law enforcement in its activities. And so to simply set these aside as common violations is -- I guess that they're common violations does not excuse them.

And petitioner does not and has not put forth any evidence to explain why these violations occurred or why they are not willful. And at this point in the proceeding, it is the petitioner's burden to show that they have a high -- or, like -- they have a likelihood of success on the merits. They do have a heightened burden to alter the status quo, but they have -- ATF would posit that they have not met a burden to show that they have a high likelihood on the success here.

With regard to two of the cases cited, Your Honor mentioned one of them where it was either out of Minnesota or Wisconsin -- I think Minnesota, but where a PI was, in fact, granted. And there are definitely different circumstances in that case, as recognized by the petitioner and the court, but there were also other circumstances in that case, including that the FFL there sold most of their inventory, I understand, to a large metropolitan police force. They were the only FFL that could provide certain weapons to that police force, and

they were the only FFL with a particular type of license from the State of Minnesota. We don't have those facts here.

And with regard to *Web Guy Enterprises*, I would note that the court has ruled on summary judgment in that case and ruled in favor of the ATF, and so I wanted -- I wanted to note that.

And I know we note this in our response, which the court has clearly reviewed, but the petitioner seems to argue that because they haven't been given prior reports of violations or prior notices and given warnings during compliance inspections that they -- somehow that the court can't uphold the revocation here. I know they don't necessarily explicitly say that a prior warning is necessary, but I want to -- wanted to emphasize that a prior warning is not necessary, and there are a multitude of violations in this case.

The fact that they are quote/unquote common violations, I would note that this petition has far more than the average common violation. And so to the extent that these numbers in the report submitted last night are availing or -- I mean, we haven't really gotten into those numbers. But when you look at them and break them down, the petitioner has far more violations when you look at just the average number of violations versus the number of people that are cited for violation.

THE COURT: Ms. Macke, if I can just interrupt for a moment or two and ask: My perception of the legal standard that the court is required to apply is to determine whether the petitioner has committed at least one willful violation. I know there are a number of violations that your argument this morning have said were serious, they were substantial matters. I really want to focus on the willful ones however. And are you able at this stage to identify the violations that, in the -- in the agency's view, are -- were willful that led to this revocation decision?

MS. MACKE: When you -- so I'm going to ask for a little bit of clarification. So the ATF found eight separate willful violations, and within those eight, for example, the A&D records and not being able to account for 16 handguns. So those 16 all fall under one violation. And so are you asking if I have the evidence to show, like, all 16 of those firearms that were missing?

THE COURT: Well, I'm really -- I'm really trying to understand what it is -- because the truth is -- even though you all have litigated this dispute very quickly, you've litigated it very effectively and your presentations are effective, the truth is you're ahead of the court at this point because I didn't start in this as soon as you did.

I'm trying to discern, number one, what violations -- you don't have to articulate them all by name right now spoken,

but I want you to direct me to the violations that the ATF says those are the willful violations and those are the reason we're entitled to revoke the petitioner's license.

MS. MACKE: So that would be contained in the government's -- I think it's Exhibit 3.

THE COURT: All right.

MS. MACKE: No, it's Exhibit 4. That is the July final notice of revocation that outlines the various violations, and particularly with regard to Subsection 2, which is Document 16-4. And starting on page 4 in paragraph -- starting on page -- or paragraph 7, that identifies the violations that are at issue and identifies all eight of the willful violations that the ATF found.

THE COURT: Now, let me -- all right. Thank you. That helps me. And I confess, not to make excuses, but I don't have -- I don't have a functioning printer at home and so I would have -- I'm not as -- I'm not as organized as I'd like to be, but I want to be able to take a thread back with me, because come tomorrow or Sunday, depending on how I test, I can actually go back to the courthouse so I'll have hard copies. And so this is your chance to direct me to those violations are the ones that have -- this proceeding before the court are the ones the ATF is relying on. Just give me the thumbnail on what is that -- that's in the record that supports the bureau -- the agency's conclusion that those qualify as willful conduct? Is

it the prior compliance? Is it the training? Is it just -- is it the same for all eight or is it different for the eight?

MS. MACKE: So some of the things that are relied upon are the same for all eight, and then there are a couple of instances where the director noted some of the comments that were made by the petitioner as additional evidence. So -- and you can find these in paragraph 7A and B of Document 16-4.

THE COURT: Okay.

MS. MACKE: And so the -- the director found that ATF had reviewed the applicable laws and regulations with the licensee, at least during the qualification inspection in 2007 and during a compliance inspection in 2017. And as noted by the director and attached as Exhibits 1 and 2 to the government's response, the petitioner signed acknowledgements in conjunction with both of those training that stated that the investigator explained the information that was in there to him and that he understood that he was responsible for familiarizing himself with the regulations and knowing those regulations. And then the director also noted that over the years the licensee has demonstrated an ability to properly comply with the regulations.

So, you know, they can't sit there and be, like, I have always misunderstood this regulation, I wasn't acting indifferently, I thought I was acting in compliance, which is sometimes what people will say. And here the licensee had

demonstrated that they knew how to comply and then failed to.

THE COURT: Let me ask you -- go ahead, I'm sorry.

MS. MACKE: Sorry. The petitioner had had some -- some minimal violations that were noted in 2017, and it appears a report of violations was not issued at that time. It appears that the investigator, I guess, more informally counseled them on that, not as part of a formal procedure but as part of their general inspection in providing training on how to do things.

And, sorry, you had a question, Your Honor?

THE COURT: I do, thanks. You indicated that there were some of the willful violations which belonged in their own category; in other words, the agency relies on evidence of willfulness that is specific to them. Can you just point me to those violations and what that evidence is?

MS. MACKE: And with regard to some of the statements that the petitioner made to the investigator?

THE COURT: I don't know. That was really my question: What are those and what do they rely on?

MS. MACKE: Your Honor, I'm not sure I understood your question; I apologize to make you ask it again.

THE COURT: No, that's quite all right. When you -- when you started to respond to this part of it, you said that for some of the violations that you contend are willful, we rely on the same sort of theories: prior compliance, familiarity -- demonstrated familiarity with the requirements

and so forth. You said that for some of the willful violations, at least as you perceive them, there were separate buckets of evidence that justified the willfulness conclusion. I was really trying to understand what those others that have separate buckets are.

MS. MACKE: Right. Yeah, no, that makes sense. I think each of the violations is a little bit different. So, for example, on the failing to timely report the notice -- the notices -- or, sorry, the multiple sales, the forms -- both forms, the firearm transaction record and the actual multiple sales form, explicitly tell the licensee that they have to report it by the close of business, the multiple sales. And in the case of the Form 4473, and that's the firearm transaction record, it has that in bold letters directly under where the FFL signs the form. And so, you know, that's an additional kind of factor that says you should have known this and you have repeatedly failed to do it.

And, frankly, that form where the -- the petitioner or FFL signs it specifically says, "I certify that I have read and understand the notices, instructions and definitions on this form." And the petitioner is certifying that every single time they sign these. And so they -- either they're just not reading the -- the forms that are mandated, which I think would absolutely support a finding of plain indifference to your legal obligation, or they're certifying that they've done

things that they haven't done, which I think is problematic, or they have read it and they're just not complying.

THE COURT: Let me ask about a related but different subject. The Norris transaction in December of 2021, as I read the cases, the court's permitted to accept evidence outside what I would traditionally refer to as the administrative record. In light of this what I'll call new evidence the court has received, I'm thinking specifically of Mr. Norris's affidavit, I guess my question is if the court concludes that what happened then is what Mr. Norris says in his affidavit, does the agency still contend that's a violation?

MS. MACKE: Right, so the violation here does not depend on whether Buddy Norris was actually a prohibited person or whether Buddy Norris was actually purchasing the gun for his wife. And so what kind of happened after the sale occurred is irrelevant to the ATF.

From the ATF's perspective, you have two individuals who are certifying that they are the actual purchaser. And based on the facts -- well, I think there's going to be a dispute on the facts. But if somebody comes in, they're an actual purchaser, they're denied when the NICS check is run, and the same day or shortly after they're denied somebody who comes in has the same address, lives at the same place is buying the exact same gun goes, "I'm the actual purchaser," there are supposed to be red flags that go off that, hey, this

-- this could be a illegal transaction and I should stop this sale from moving forward.

THE COURT: But as I understand things, Ms. Norris showed up and she announced to the salesperson I want to buy this gun, I want to buy it as a gift for my husband. And it's at least argued that the ATF's regulations allow a qualified purchaser to purchase a gun and make a gift of it under certain circumstances, but that still the donor has to have a background check performed on them. Am I -- am I correct so far?

MS. MACKE: Are you asking if the donor -- so if in this case let's say Patti Norris was able to purchase the gun as a gift for her husband, would Buddy have to come in and get a background check; is that your question?

THE COURT: No. My understanding of how it worked is when Ms. Norris announces, "I'm buying this gun and I'm planning to make a gift of it," she has to have a background check and she has to pass it. We're all agreed on that?

MS. MACKE: Yes.

THE COURT: As it turns out, she didn't pass it. And so she goes home and she tells her husband these are the facts, at least in the respondent 's view -- or petitioner's view: I wanted to surprise you with this. Turns out I'm not qualified for whatever reason, I don't remember that reason, but I'd like to give you the money. You can go in and purchase

it. The gift is now my money to you and you're going to end up owning the same gun.

And Mr. Norris comes into the store. He says, "I'm here to buy the gun." The gun's still in inventory. They perform a background check on Mr. Norris. He passes it and the transaction's completed.

I'm trying to understand what that violation is and then what makes it willful for this particular petitioner.

MS. MACKE: Right. And I think that there's a basic dispute about the actual facts here, and that's probably kind of why -- I don't want to say we're talking around each other, but I'm not doing a good job of explaining it.

THE COURT: Well, what's -- what's your client's version of those facts?

MS. MACKE: So from ATF's perspective, when somebody comes in and says I want to buy this -- so people who are trying to unlawfully obtain firearms will lie. And the FFL is kind of the first line of defense when somebody is trying to get a gun and they're not able to. And so if there are indicia that should put the FFL on notice that, hey, there's something going on here, I have someone telling me they're the actual purchaser, they were denied, and then somebody else comes in and says they're the purchaser but they live with this person, there are concerns there.

Now, I -- my understanding is that when the

investigator first asked Mr. Theede about this, Mr. Theede did not have any explanation. And then I think at the hearing there were timing issues as to when Mrs. Norris announced that she was purchasing it as a gift. You know, did she come in on the 11th and before anything she said, oh, you've got this gun in stock, my husband's been looking for this, I want to buy this as a gift for him, or did she say this is a gift for my husband after she was denied being able to purchase it. Does that make sense?

THE COURT: Yeah. Why does it matter? She didn't end up buying it.

MS. MACKE: Right. So if Buddy Norris was purchasing the gun for Mrs. Norris, then that would be a straw purchase as I understand it.

THE COURT: I understand, and I don't think that -- I don't think that's disputed. But I haven't heard any facts that suggest that was what was intended from the beginning.

MS. MACKE: So the violation issue is not that there was an actual straw purchase that occurred.

THE COURT: Okay.

MS. MACKE: It's that the certification should have put the petitioner on notice that there is something going on here, we shouldn't be able to -- we shouldn't sell this gun, even if Buddy Norris could go down to the next FFL who doesn't have this background and purchase it legally. So...

THE COURT: So the agency's position is that when Mr. Norris showed up to buy the gun, they should have said, sorry, we can't sell it to you because we think something's amiss here?

MS. MACKE: Yes, that's my understanding.

THE COURT: All right. Let me ask the final question about this. Actually, I have two final questions about it. You say that Mr. Theede couldn't respond, at least not immediately, to the investigator's inquiry about this. When -- when was that inquiry made?

MS. MACKE: I don't have that date as I'm sitting here right now.

THE COURT: Well, what -- are you saying he couldn't respond during the proceeding before the -- the administrative proceeding or during the compliance investigation?

MS. MACKE: During the compliance investigation, and I believe -- it would have been at the time of the report of violation, which was October of 2022. I don't have the specific date in mind.

THE COURT: Does that strike you as that -- does it strike you that that's that unusual that the owner of an enterprise wouldn't have immediate grasp of the granular facts about a particular transaction 10 or 11 months earlier?

MS. MACKE: Well, Mr. Theede's name is the name that is signed on, I believe, every single form that's at issue in

this case, and so he was the one who is signing the form.

THE COURT: All right. And so let me close with this question about this and then I want to go to one last subject with you, and then I need to give the petitioner some time to close our proceeding this morning. There is this argument from the petitioner that, look, but for the Norris transaction and the misunderstanding about what happened, we wouldn't be here. I take it the ATF has a view on that. What is it?

MS. MACKE: The ATF would absolutely deny that view.

THE COURT: Last question to you this morning. There is an assertion I believe in the petitioner's papers, I don't remember whether it's in the reply or their original motion, the memorandum supporting the motion, that the ATF has made a policy choice recently to something around the phrase zero tolerance or no tolerance for any willful violations. Has there been a policy change of that nature recently?

MS. MACKE: So the idea of zero tolerance I don't think is accurate. I believe that there has been a policy perhaps shift or enforcement -- I'm blanking on the right word here, but a -- basically a shift in, I guess, priorities.

THE COURT: Okay.

MS. MACKE: And so there are certain violations that will require a hearing, and that may not have been the case 20 years ago but that's not the petitioner's, I guess, prerogative to weigh the judgments of the ATF and what --

THE COURT: I understand. I've been -- yeah, I don't --

MS. MACKE: The violations still must be willful. It's not some sort of strict liability regime that some people may be suggesting.

THE COURT: Is it -- and you may not know. Is the current ATF policy that an agency conclusion that there's been one violation will require a revocation hearing or will require a revocation, either one of those?

MS. MACKE: My understanding, and I may look to my agency counsel here to give me a thumbs up or thumbs down, is that there are certain violations that do require a revocation hearing but not that require revocation even if there is a willful finding.

Mr. Bergus, can you give me a thumb's up or a thumb's down?

MR. BERGUS: (Thumb's up.)

MS. MACKE: Okay. Let the record reflect a thumb's up.

THE COURT: All right. And that policy shift, what's the -- roughly the era for that decision or policy shift?

MS. MACKE: As far as when that policy shift started being --

THE COURT: Correct.

MS. MACKE: I believe July 2021.

THE COURT: All right. Thank you very much, Ms. Macke, for your presentation.

I want to close -- I want to go back to the petitioner, Mr. Rudd, and let you close the hearing this morning, and then I want to take a moment offline to figure out what's next.

Let's -- let me ask you to start where I concluded with respondent's counsel and the ATF has acknowledged a shift in enforcement approach. I don't want to put policy or procedure on it, but just there is a -- there is a difference there. And I guess my question is isn't the agency leadership entitled to make a policy decision like that under the law?

MR. RUDD: So, Your Honor, there is certainly no doubt that in 2021 the current administration announced what it calls its zero tolerance policy, and that ATF has trained on this in many places where I've been in the room with them on their -- what they call the five deadly sins. And there are a subset of violations that finding even one of them automatically triggers the hearing and the revocation process, but you cannot by policy get rid of the willfulness standard.

And so, yeah, as a practical matter, revocations year -- fiscal year 2022 over 2021 are up somewhere around 500 percent I think is the last number that I saw. And certainly -- certainly there is some room, although I would argue that an administration -- administration can't simply

jettison 20 years of enforcement and you move into the area of arbitrary and capricious when you all of the sudden start revoking licenses on records that you never even would have as soon -- begun to revoke a license before. But, yes, there clearly has been a policy shift.

But what the ATF cannot do is it cannot get rid of the willfulness requirement. And what we've heard from the government this morning, when you've asked for their evidence of willfulness, what you've heard is there were violations. That's it. They want you to draw an inference.

One of the inferences that they want you to draw and that they say supports their finding of a violation of willfulness is the relative clean record that Heartland Outdoor has. In no other world can doing it right for 15-16 years lead to the presumption that an error must necessarily be willful. We're talking about --

And, Your Honor, if -- would it be all right, assuming that Mr. Roger Theede is still under oath, if I asked him a number -- if I asked him a question real quickly?

THE COURT: Of course.

REDIRECT EXAMINATION

BY MR. RUDD:

Q. George, can you give me a rough estimate of how many firearms Heartland Outdoor sells per year?

A. Between 900 and a thousand.

Q. 900 and a thousand.
Are your 4473 Forms -- is there a 4473 for every transaction?
A. Yes.
Q. Are those completed by hand on paper with pen and ink?
A. Yes.
MR. RUDD: So, Your Honor, the mere existence of a violation doesn't necessarily or, frankly, under any -- on most circumstances ever just by itself lead to a conclusion of willfulness.
Now, one thing that is very important for the court to understand and I want to clarify, counsel mentioned that this inspection period went back -- included one year, but there are multiple facets of an inspection. For example, if I'm inspecting forms, I can inspect forms for a year. When I start doing my firearm inventory so that I can examine the acquisition and disposition record, I necessarily have to use the whole record because the whole acquisition-disposition record goes back to the beginning of time. And I might have a gun I haven't sold -- or sold 10 years ago that I haven't logged out that might be found during an inspection, and they say, hey, this gun's not here but there's an open disposition entry.
And so we need to make sure that we're speaking with precision as to the nature of the inspection. When it comes to

the acquisition and disposition record, that is not just looking at a one-year period. That's looking at the entirety of the record, and so that's important to understand.

THE COURT: Can I ask you -- can I just stop you a second, because my computer has -- I now got it back. You can continue. Thank you.

MR. RUDD: Yes, Your Honor. I would posit that we have not heard any evidence of willfulness other than you've done it right forever. And the presumption that any failure short of perfection at that point must have been because of plain indifference, Your Honor, I don't think that carries the day for ATF.

I don't want to spend too much time on the Norris matter, but it is important and so just nuanced. Say my wife wants to buy me a gun. When she goes to do that, the law requires and the form says if you are purchasing a bona fide gift for somebody else, you are the actual purchaser when you complete that transaction. Well, she was going to be the actual purchaser for the transaction. ATF doesn't regulate who gives money. They don't care whether I pay with cash, whether I pay with credit card, whether I pay with a gift card that someone else gave me. ATF doesn't regulate that. They regulate transactions.

If a customer is purchasing a firearm for a gift and taking possession of that firearm to then give to someone else

and it's a bona fide gift, that customer is the actual purchaser.

If someone comes in later to get a gun for themselves irrespective of who financed it, the customer who comes in to get the gun is the actual purchaser.

There's -- there's the illusion of incompatibility here, but when you look at it, there's simply not incompatibility.

And so I think it's clear to understand the role of the FFL is to -- if they see something that is questionable -- and I've literally trained FFLs for decades, and I train them to ask questions, make sure that you have asked the right questions so that you can make a decision. Nobody ever -- and -- and I would love to -- to have an opportunity to question the IOI on this. Nobody ever thought that this 5.56 NATO Saint Victor AR platform firearm was for Mrs. Norris. Testimony that the court has is that she's never even touched it, that she's never shot it, she's never held it, she didn't even carry it out of the store, and it's in Mr. Norris's safe.

ATF is not entitled to presume ownership or failure without doing an investigation. I can tell you it took about 10 minutes to run down Mr. Norris and talk to him. ATF has investigator -- investigatory power. That's what an industry operations investigator is supposed to do. I don't know how -- I don't know how he would even begin to stand by that

violation.

I've already mentioned it's an odd world when your good record becomes the basis of a finding of willfulness.

Irreparable harm, I think -- I think you've heard irrefutable evidence on that. Heartland Outdoor has testified that the store -- and they -- they have expenses. They have employees. They have rent. They have all of those things. It's not a cash cow. It makes "x" amount of money. The testimony was that if they don't sell guns, that business loses over a hundred grand a year and will not be in business. There's no real question about irreparable harm.

One of my concerns and one of the things counsel said is that it's our burden. Well, it's our burden to show likelihood of success, irreparable harm, evidence of that, that's our burden. But the likelihood of success question has to factor in that it's ATF's burden to show willfulness, and you -- that burden can't be shifted to us. There is no presumption of willfulness because a violation existed.

I would also argue that simply taking the numbers from Exhibit B, as ATF has done, and divided them by the number of inspections to come up with an average, that's speaking in a vacuum. You can't say per violation or per revocation how many violations of what there were.

What we do have, however, is a pretty well-rounded track record of the types of cases that have gone to revocation

and come up before courts. When ATF has found willfulness and the courts have upheld it, it has either been the case of the six that were cited in our reply where there is irrefutable "knew my obligation, just simply knowingly didn't do it and didn't care." There's that. That will get you revoked without any warning. Everything else the evidence of willfulness is the repeat of the violation. The case law -- the case law could not be more clear. Other than -- and we don't have that here. Other than that, there's no evidence.

One thing that -- one thing that counsel said was, which I found interesting, that, well, one piece of evidence is the fact that there's that checklist that shows that they've gone through the rules. Well, that checklist is gone through at every inspection -- application inspection and every compliance inspection. Nobody's questioning whether Heartland knew the rules. We know they knew the rules because their record shows that they follow the rules. But the standard's not perfection, and you have to show something to show willfulness, and it's not there.

Your Honor, I don't want to beat a dead horse and so I won't. I'm certainly happy to answer any questions the court has. I do not see any means in which justice is rendered that does not give Heartland Outdoor its day in court, its opportunity to question ATF the way they would have been questioned had -- had Heartland been represented at counsel --

or by counsel at the quote/unquote informal, albeit less than informal, hearing. And so, Your Honor, I -- I do request that the court allow Heartland Outdoors to remain in business through this judicial review process. And I would argue that the status quo and the when was the last peaceable moment before -- before this matter went sideways, for lack of a better word, was when -- was when Heartland Outdoor was operating under its license as it has been for a decade-and-a-half.

So I thank you for your time, Your Honor. I don't have anything else.

THE COURT: Thank you very much, Mr. Rudd.

And, counsel, here's -- give me just a moment to look at the world ahead of me. I'm just going to look at my calendar and I'll have some thoughts about what we might do next.

Here's what I'm going to ask you to do: I'm going to take a recess. I want a moment to look at my notes and confer with the law clerk, check about the calendar. I just ask you all to look at your calendars in the days between now and September 26th, which I know is an important date in the case, so that you'd be ready to discuss proceedings between now and then.

So we're going to go into recess. I'm going to turn off my camera and my microphone. I'll ask Ms. Garrett to check

in a few minutes to make sure everybody's reassembled and I'll rejoin you, but we're going to -- we're going to adjourn at least for about 5 to 10 minutes while I figure out a path forward. Thanks very much, counsel.

(Recess.)

THE COURT: We're back on the record. I didn't say at the outset, but it's obvious we have been proceeding across Zoom video this morning because of a health issue in the presence of counsel and client representatives.

Here's what I'd like to do going forward: I'm going to ask you to reserve some time on your calendar -- I'm looking at a week from today. Counsel, are you generally available on the morning of the 22nd? Mr. Rudd?

MR. RUDD: Yes, Your Honor, I'm available that morning.

THE COURT: Ms. Macke, are you available that morning as well? I think you're muted.

MS. MACKE: Yes, Your Honor. I have another hearing, but I think I should easily be able to have someone else cover that.

THE COURT: All right. And I -- let's set this for that morning at ten o'clock Central Daylight Time. Let me think about that. Yeah, we're still on Daylight Time then.

What I would say to you is, first of all, thank you for your high-quality lawyering and presentations this morning.

I thought the presentations were very well-focused and effective and efficient, and I'm grateful for that especially. I can't tell you how much difference it makes for decision-makers, when you get this kind of presentation as opposed to others, so thank you for that.

I want to reserve that time because it is possible that I would want to gather you again to ask some follow-up inquiry about areas of concern that I may have once I re-review the record in light of the arguments this morning.

I will also tell you that if I conclude I don't need that time, I will ask Ms. Garrett to notify you on at least Thursday. I'll aim for Thursday morning to say, look, I'm not going to consume your time needlessly, we can scrub that on Friday, that way you don't have to show up just for the sake of showing up. So it's a provisional setting. I'd ask you to hold the time. If it turns out I don't need your time, we'll communicate that.

And then I would plan to issue an order. I know the clock is ticking toward the 26th, and I have that firmly in sight. So one way or another my goal would be to issue -- not just a goal, but my aim would be to issue an order before the 26th.

Does that seem like a peaceable way to proceed, Mr. Rudd?

MR. RUDD: Yes, Your Honor. Thank you.

THE COURT: And for you, Ms. Macke?

MS. MACKE: Yes, Your Honor.

THE COURT: Yeah, and I would tell you that at least -- unless my tests -- my performance on testing goes awry, that would -- I would plan to be able to be in person. But given the logistics and the like that it might go off, I'd be willing to proceed as we did today. If counsel told me, no, no, I absolutely want to be there if we're going to have it, I'd let you be in the courtroom. And, you know, if you said, you know, we found the technology to be pretty good, pretty effective, we can do it that way.

Mr. Rudd, Ms. Macke, can I just commission you two to talk about that position and let me know the parties' position if we want to meet on the 22nd and if so let me know how. I'll let you know the decision on the form no later than Thursday evening.

Mr. Rudd, you would have to travel to get here if we're in person, am I right? Whereabouts are you located?

MR. RUDD: Dayton, Ohio.

THE COURT: I doubt there's a non-stop flight, but I bet you could get here on Thursday for a Friday hearing.

MR. RUDD: I could get here if I needed to. And I'll be honest, while I much prefer an in-person hearing, I prefer the in-person being what we did today. I'm not sure it justifies the travel for the follow-up. Ms. Macke and I can

confer about that.

THE COURT: Why don't you talk about that. I completely agree. I like being in the same room with lawyers just -- it is helpful, but I'm not sure for the kind of targeted follow-up next Friday that we need to make that big a lift. So you all talk about that. I'll let you know my decision about whether that session is warranted and we'll go from there.

I don't anticipate receiving additional submissions from you. I think the issues are well-briefed. And if there were questions, it would be -- I think I could present them during the supplemental hearing next week.

So thanks again for your participation and your presentations this morning. Prepared to close the record here. But before I make that last statement, Mr. Rudd, is there anything else from petitioner's side of the caption?

MR. RUDD: No, Your Honor.

THE COURT: From you, Ms. Macke?

MS. MACKE: Your Honor, if I could bring up one item more housekeeping --

THE COURT: Please.

MS. MACKE: -- looking forward.

THE COURT: We were just -- we were within inches of a clean get away here. Go ahead.

MS. MACKE: I will make it quick, and this may be

something that Mr. Rudd and I will need to talk about afterwards. But we have all of the exhibits and everything from the hearing as part of the administrative record and are going to be working on redactions, but there is a lot of PII in there and there are a lot of names of firearms purchasers. And while I have you on the line, I wanted to see if you have any preference as to whether we file unredacted items -- we'd still redact Social Security numbers, but unredacted -- an unredacted record under seal, or if we should just redact all of the names and addresses and everything and file it publicly or if you'd prefer to have both options?

THE COURT: I'd prefer that -- I'd prefer that the courts that we must follow change the standard on what we permit to be filed under seal, but they don't work for me.

I think, as you move forward to complete this process, if -- if the parties here agreed that the names of individual firearm purchasers are shown in parts of the administrative record and there's no good reason for those names to be on the public record, that I'd be inclined to go along with you. And naturally if one purchaser became an essential part as the Norris transaction kind of has, we're kind of already there on them, but for the rest of the people who bought firearms from this licensee, I haven't heard any reason that would warrant their names being put in the record of the case. Do you see it differently, Ms. Macke?

MS. MACKE: No, Your Honor. And, again, this might be something that counsel, we need to discuss if there are specific names like the Norrises that are going to be coming up, but I think some of these documents are going to be protected by the Privacy Act. And so I just want to make sure that, you know, to the extent the court has a preference as counsel discuss it, we can have your preference in mind.

THE COURT: Yeah, I don't have strong feelings about this. It's a pretty demanding standard on our circuit what can be sealed, but it sounds like here the Privacy Act's going to supply some competing considerations. I think you're ahead of me already on what that provides. And I really would be, given the way counsel has performed in the case so far, be interested in hearing your -- your views about that, because what you've talked about makes some sense to me at least so far.

MS. MACKE: Thank you, Your Honor.

THE COURT: All right. All right. Thank you again. We'll go ahead and close the record in the case and sign off. So long everyone. Thank you again for accommodating my situation to do this by Zoom.

(Proceedings adjourned.)

CERTIFICATE

I certify that the foregoing is a true and correct transcript from the stenographically reported proceedings in the above-entitled matter.

DATE: September 27, 2023

/s/Kimberly R. Greiner
KIMBERLY R. GREINER, RMR, CRR, CRC, RDR
United States Court Reporter